2019 UT App 173

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JUSTIN WILLIAM POPP,
Appellant.

Opinion
No. 20180224-CA
Filed October 31, 2019

First District Court, Brigham City Department
The Honorable Brandon J. Maynard
No. 171100138

Staci A. Visser and Ann M. Taliaferro, Attorneys
for Appellant

Sean D. Reyes and Tera J. Peterson, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1 A jury convicted Justin William Popp of two counts of sodomy upon a child. Popp appeals his convictions, claiming that the trial court erred in several respects, and that his trial counsel provided ineffective assistance. In connection with his ineffective assistance claims, Popp filed a motion, pursuant to rule 23B of the Utah Rules of Appellate Procedure, asking us to remand the case to the trial court for supplementation of the record. For the reasons that follow, we reject Popp's claims that the trial court erred, as well as all of his claims of ineffective assistance that are based on the appellate record. However, we agree with Popp that remand for supplementation of the record is necessary on one of his claims for ineffective assistance, and

therefore partially grant his rule 23B motion and remand for the limited purpose of conducting further proceedings on that claim.

## BACKGROUND[1]

¶2 In 2007, when F.H. was approximately three years old, her mother (Mother) began dating Popp. Shortly thereafter, Popp and Mother, along with F.H., moved in together. Popp and Mother had a child (B.J.) together in 2008, and eventually married in 2013. A little more than a year later, however, their relationship soured; they separated in January 2015 and finalized their divorce in July 2015.

¶3 The divorce proceedings were contentious, and the divorce court eventually entered an order awarding Popp and Mother joint physical custody of both children but, due to Mother's work schedule, awarding Popp the majority of the parent-time and ordering Mother to pay Popp child support. Although Popp is not F.H.'s biological father, neither Mother nor Popp wanted to "split up the kids" at that point, so they worked out an arrangement where the children would continue to reside largely with Popp, and would visit Mother three weekends each month. For about fifteen months, everyone followed this arrangement without major incident. But in September 2016, F.H.—who was twelve years old by then—asked if she could live with Mother and her new husband full-time, and Popp agreed; B.J., however, continued to live with Popp.

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116. "We present conflicting evidence only when necessary to understand issues raised on appeal." *Id.*

¶4 About six months later, in March 2017, F.H. witnessed Mother and her husband having sex as she walked by their bedroom door on her way to the bathroom, and became "very, very upset." In an attempt to console F.H., Mother asked her why she was so upset, and F.H. responded by telling Mother that Popp had sexually abused her. Specifically, F.H. recounted an incident, "when she was younger," in which Popp told her that he had a "magic spoon with frosting on it and made her lick it off," but the spoon was actually his penis. The next morning, Mother called the Division of Child and Family Services (DCFS), and scheduled an interview between F.H. and a DCFS investigator (Investigator).

¶5 The interview (CJC Interview) was conducted at the Children's Justice Center by Investigator while a detective (Detective) watched from an adjacent observation room. Investigator asked F.H. what she had told Mother about Popp. F.H. explained that when she was "seven or eight," while Mother "was at work," Popp "put frosting on his thing and then he made [her] lick it off." F.H. explained that Popp had "asked [F.H.] if [she] wanted a treat" and when F.H. said yes, Popp blindfolded her and made her "kneel down" and lick "frosting on his penis." Then, after the frosting was gone, Popp "put the frosting back in the fridge," "washed his hands," and removed the blindfold. When Investigator asked F.H. why she believed she was licking Popp's penis, F.H. said that, as she was kneeling down she began to lose her balance, and when she reached out to catch herself she "grabbed onto [Popp's] leg and he didn't have any pants on."

¶6 F.H. then described another incident with Popp, which had also occurred when she was seven or eight. This time, Popp asked F.H. "to help him clean some bottles." They proceeded into an unlit bathroom where Popp asked F.H. to "sit on the toilet" and "use [her] mouth to clean the bottles." F.H. then "put [her] mouth on the bottle and . . . lick[ed] it clean." F.H.

explained that she "knew it wasn't a bottle because it wasn't hard. . . . It was like squishy and warm." Although F.H. was unsure exactly how many times Popp had asked her to perform these acts, she knew that it had happened "more than once."

¶7    After the CJC Interview, Detective attempted to interview Popp. Detective visited Popp's house multiple times, left his business card on Popp's front door, and spoke to Popp on the phone. During their phone conversation, Popp indicated that he would "be willing to come into the police department for an interview" the following day, but that he "needed to get with his attorney first and make sure that was okay." Popp never showed up for the interview, however, and he later told Detective that "his attorney had advised him not to."

¶8    After completing its investigation, the State charged Popp with two counts of sodomy on a child, both first-degree felonies. Prior to the preliminary hearing, the State moved to admit the CJC Interview pursuant to rule 15.5 of the Utah Rules of Criminal Procedure. Popp did not object to the State's motion, and the CJC Interview was played at the hearing. After the hearing, during pretrial proceedings, the State again moved to admit the CJC Interview, this time for use at trial. In its motion, the State addressed how each of the rule 15.5(a) factors had been satisfied. Popp filed an objection to the State's motion, but raised only one argument: that admission of the CJC Interview would violate Popp's right to confront his accuser. However, prior to the start of trial, Popp withdrew this objection after learning that F.H. would be present at trial and available for cross-examination about the CJC Interview. As a result, the court declared Popp's objection "moot" "as long as [F.H.] is present."

¶9    In October 2017, the trial court ordered both parties to disclose their trial witnesses by December 5, 2017—one month before the scheduled trial date. Each party timely disclosed one expert witness: the State disclosed Investigator, and Popp

disclosed an expert who would "testify about the propensity for child witnesses to recall or falsify testimony" and "the proper techniques that need to be used when interviewing child witnesses and whether they were used in this case." Then, on December 29, 2017, Popp's counsel notified the State that he intended to call three additional witnesses at trial: Popp's mother (Grandmother); Popp's close friend (Popp's Friend) who had lived with Popp and the children for a long period of time; and Mother's close friend (Mother's Friend).[2] Trial counsel indicated that these witnesses could "testify to impeach the State's witnesses with regards to how [F.H.] acted during the time frame that she has alleged to have been abused and after," which behavior they observed "did not change . . . in any way shape or form during the time of the alleged abuse." Popp's counsel urged the court to grant a continuance to allow the State time to investigate the proposed witnesses, but the State opposed counsel's request and instead asked the court to preclude the witnesses due to counsel's untimely disclosure.

¶10    The day before trial, the court held a telephone conference to discuss the new witnesses and counsel's untimely disclosure. During that conference, the State offered a compromise, proposing that the witnesses be allowed to testify but only as rebuttal witnesses "if the [S]tate addresses or elicit[s] information about" any behavioral changes on the part of F.H. Thus, absent any allegation of behavioral changes, the witnesses

---

2. In his rule 23B motion, Popp contends that he told counsel about these potential witnesses in late November, before the court-ordered disclosure deadline. Then, according to Popp, he again provided counsel the names and phone numbers of the potential witnesses in a subsequent meeting on December 28, 2017. The next day, on December 29, counsel notified the State that he intended to call these witnesses at trial; Popp contends that counsel did so without having spoken to the witnesses.

would not be allowed to testify. After some initial hesitation, trial counsel agreed to the compromise. At the end of the conference, counsel also notified the State that he would not be calling the disclosed expert to testify.

¶11 The morning of trial, before jury selection, the State informed the court that it would be asking Detective "if he was ever able to have an interview or meet with [Popp]." The State explained that the purpose of the question would be "to show that [Detective] was doing his job, he covered his bases and that he did everything he could to, you know, investigate the case," and that the evidence would not be used "to suggest guilt or say [Popp's] trying to hide something." Moreover, the State assured the court that it would not mention Detective's statements in closing. When asked by the court if he had any comment on the matter, Popp's counsel responded, "No."

¶12 During trial, the State played a video recording of the CJC Interview and called four witnesses: Mother, Investigator, F.H. and Detective. Mother testified as to how F.H. initially disclosed the abuse to her, and stated that she had never "told F.H. how to testify" regarding the abuse. Investigator testified about F.H.'s CJC Interview. She explained that the interview had been conducted according to national guidelines designed to allow the child interviewee to tell the story "in their own words" without the interviewer "putting any ideas, any suggestions into their head." F.H. then testified that she had watched the CJC Interview and that it was accurate. F.H. also reiterated that Popp had made her lick his penis on two occasions: once when he asked her to "lick off the frosting," and once when he asked her to use her mouth "to clean the bottles." F.H. concluded by stating that no one had told her how to testify.

¶13 Finally, Detective testified that he had observed the CJC Interview from an adjacent room. He testified that he had undergone training and considered himself an "expert" in

interviewing children because he had been working in the field for nine years and had watched and conducted "hundreds of interviews." Popp's counsel objected to this testimony based on relevancy, but withdrew the objection upon the State's explanation that Detective's "training and experience" would allow him to "comment on whether [Investigator] accurately and correctly followed the guidelines." Detective testified that the guidelines are "highly reliable" and that, based on his observations of the CJC Interview, Investigator had complied with the guidelines "very well."

¶14 Detective also testified about his experience investigating sex crimes. He noted that, in his experience, "[i]t's very common" for a child victim to not remember every single instance of sexual abuse, and "[i]n most cases" a child will delay disclosing sexual abuse. Moreover, "it's very rare" for there to be forensic evidence in sex abuse cases, and in cases with a delayed disclosure "[t]here's [a] 90 plus percent chance that there's not going to be any forensic or physical evidence to collect and preserve." As a result, investigations for this type of crime "rely heavily on the interview process."

¶15 Detective then explained what measures he had taken to investigate the case. Specifically, he testified that, after he observed the CJC Interview, he unsuccessfully attempted to interview Popp. Detective explained that, after visiting Popp's house multiple times without success, he was finally able to reach Popp by phone and schedule an interview for the following day. However, after Popp failed to attend the scheduled interview, Detective again contacted Popp, and he recounted to the jury that Popp told him that Popp's "attorney had advised him not to interview with [Detective]."

¶16 The State then rested its case. The defense called only one witness, Popp, who testified for approximately ten minutes. Popp testified about his relationship with Mother and the

children. He explained that F.H. was not his biological child—a fact he believed F.H. was unaware of until she moved in with Mother after the divorce—but he had always treated her as his own. Popp also testified that his divorce from Mother turned bitter, which he attributed to Mother's displeasure with being ordered to pay child support to Popp, and with Popp being awarded the majority of the parent-time with both children. Popp noted that, for fifteen months after the divorce, both children lived with him harmoniously, and that during this time Popp had a "great relationship" with F.H. Together they would participate in fun "family stuff" such as road trips, swimming, and attending work parties. Popp explained that he agreed to let F.H. move in with Mother after she approached him and explained that she was "getting ready to do her girl things and wanted to be with [Mother]." He testified that he never sexually abused F.H., and that her allegations were categorically untrue.

¶17    After the close of evidence, counsel and the court discussed the post-evidence jury instructions in a conference outside the presence of the jury. The court told counsel that it would read each proposed instruction out loud to them, and then ask for any objections, and that, absent an objection, the court would assume the instruction was acceptable to both sides. Neither side raised any substantive objection to any jury instruction or to the verdict form.

¶18    After receiving instructions from the court and hearing closing argument from counsel, the jury began its deliberation. While deliberating, the jury sent the following written question to the court: "Did [Detective] tell [Popp] why they wanted to interview him?" The court solicited input from both sides as to how to respond. Popp's attorney suggested that the court respond by telling the jury "that they have the evidence, they have to make a decision based on what they heard." The State and the court agreed, and together they determined that "the safest thing to do" would be to refer the jury to three specific

instructions indicating that one duty of the jury "is to determine the facts of the case from the evidence received in the trial and not from any other source." After completing its deliberation, the jury found Popp guilty on both counts. The court later sentenced Popp to a prison term of twenty-five years to life on each count, with the sentences to run concurrently.

## ISSUES AND STANDARDS OF REVIEW

¶19 Popp now appeals, raising three issues on direct appeal. First, he argues that the jury instructions were improper. Second, he argues that the trial court erroneously admitted the CJC Interview into evidence. Third, he argues that the trial court erred when it allowed the State to introduce evidence of his refusal to submit to a pre-arrest interview with police. Popp acknowledges that he failed to preserve these issues for appellate review, but nevertheless asks us to review them under both the plain error and ineffective assistance of counsel exceptions to our preservation requirement. "Plain error is a question of law reviewed for correctness." *State v. Kozlov*, 2012 UT App 114, ¶ 28, 276 P.3d 1207 (quotation simplified). Likewise, "when a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

¶20 In addition to the issues he raises on direct appeal, Popp has filed a motion, pursuant to rule 23B of the Utah Rules of Appellate Procedure, asking us to remand the case to the trial court in order to supplement the record with evidence to support his claims of ineffective assistance of counsel. "A remand under rule 23B is available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was

ineffective." *State v. Jordan*, 2018 UT App 187, ¶ 14, 438 P.3d 862 (quotation simplified).

ANALYSIS

I. Jury Instructions

¶21    Popp contends that the jury instructions and verdict form were "fatally flawed" because "the jury was never given a complete and accurate elements instruction." Specifically, he complains that the instructions did not "advise[] the charged time frames for the offenses," and that "neither the instructions nor the verdict form denote the specific act or conduct for which the jury . . . found guilt." Popp acknowledges that these arguments were not preserved, but asserts that review is proper under both the plain error and ineffective assistance exceptions to our preservation requirement.[3]

A.    Plain Error

¶22    Popp contends that the trial court plainly erred by "failing in its duty to provide correct instructions to the jury." He maintains that the "necessity to completely and accurately instruct the jury as to the elements of a crime is fundamental and a requirement that should have been obvious to the trial court." The State counters that plain error review of this claim is not available because Popp invited any error by affirmatively

---

3. Popp also requests that we review this claim under the doctrine of manifest injustice. Because Popp draws no distinctions between "manifest injustice" and "plain error," and because "in most circumstances the term 'manifest injustice' is synonymous with the 'plain error' standard," we simply address Popp's claims for plain error. *See State v. Maestas*, 2012 UT 46, ¶ 37, 299 P.3d 892 (quotation simplified).

representing to the court that he had no objection to the instructions. We agree with the State.

¶23    "[W]hen an error is invited by an appellant, we will not review it even for plain error." *State v. Oliver*, 2018 UT App 101, ¶ 27, 427 P.3d 495; *see also State v. Moa*, 2012 UT 28, ¶ 27, 282 P.3d 985 ("The doctrine of invited error . . . can preclude even plain error review."). The "invited error doctrine arises from the principle that a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." *Pratt v. Nelson*, 2007 UT 41, ¶ 17, 164 P.3d 366 (quotation simplified). "Under the doctrine of invited error, an error is invited when counsel encourages the trial court to make an erroneous ruling." *State v. McNeil*, 2016 UT 3, ¶ 17, 365 P.3d 699. To invite an error, a party must do more than simply fail to object; the party must manifest some sort of affirmative representation to the trial court that the court is proceeding appropriately. *See Pratt*, 2007 UT 41, ¶¶ 18–22. At least in the context of jury instructions, *see infra* ¶ 44, our supreme court has held that an instruction is not subject even to plain error review if counsel, in response to a question from the court about whether counsel has any objection to the instruction, answers in the negative. *See State v. Geukgeuzian*, 2004 UT 16, ¶ 9, 86 P.3d 742 ("A jury instruction may not be assigned as error . . . if counsel, either by statement or act, affirmatively represented to the court that he or she had no objection to the jury instruction." (quotation simplified)); *see also State v. Butt*, 2012 UT 34, ¶ 42, 284 P.3d 605 (same); *State v. Hamilton*, 2003 UT 22, ¶ 54, 70 P.3d 111 (same). We have of course followed suit. *See, e.g., State v. Ramos*, 2018 UT App 161, ¶ 23 n.9, 428 P.3d 334 (citing *Geukgeuzian*, and holding that any error was invited when counsel stated that he had no "issue with this instruction" (quotation simplified)); *State v. Pullman*, 2013 UT App 168, ¶ 23, 306 P.3d 827 (citing *Geukgeuzian*, and holding that any error was invited when counsel specifically approved the instruction in question).

¶24 Prior to instructing the jury, the trial court sought both sides' input regarding the jury instructions. As to the introductory jury instructions given at the beginning of the trial, the court gave both attorneys a copy of the instructions and a chance to look them over, and then asked generally if anyone had any objection to any of them. Popp's attorney stated plainly, on the record, that he did not. And with regard to the post-evidence jury instructions and the verdict form, the court went through each instruction and the verdict form on the record individually with counsel, pausing after each to ask if anyone had any objection. Popp's counsel did not object to a single instruction or to the verdict form, and the few suggestions he made were promptly incorporated. Thus, the instructions to which Popp now objects are instructions that his counsel specifically approved on the record. Because Popp's counsel made "an affirmative representation encouraging the court to proceed without further consideration of an issue," Popp invited any error in the jury instructions and verdict form, and therefore the plain error exception is inapplicable here and we "need not consider [Popp's] objection to that action on appeal." *See Moa*, 2012 UT 28, ¶ 27; *see also Geukgeuzian*, 2004 UT 16, ¶ 10 (stating that a defendant invites error "where his counsel confirm[s] on the record that the defense had no objection to the instructions given by the trial court").

B.     Ineffective Assistance

¶25 Next, Popp argues that his trial counsel was ineffective for failing to ensure that the jury was properly instructed. "While invited error precludes a plain error claim, it does not preclude a claim for ineffective assistance of counsel." *State v. McNeil*, 2013 UT App 134, ¶ 25, 302 P.3d 844, *aff'd*, 2016 UT 3, 365 P.3d 699. Accordingly, we evaluate Popp's ineffective assistance claim under the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). Under that test, Popp must show "(1) that trial counsel's performance was objectively deficient and (2) that

such deficient performance was prejudicial." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Popp's] claims under either prong." *Id.* As noted above, Popp identifies two potential infirmities with the jury instructions and verdict form: (1) that the instructions did not "advise[] the charged time frames for the offenses," and (2) that "neither the instructions nor the verdict form denote the specific act or conduct for which the jury . . . found guilt." Popp's first claim fails under the first part of *Strickland*'s test, and his second claim fails under the second.

¶26    To satisfy the first part of the *Strickland* test, Popp "must show that counsel's representation fell below an objective standard of reasonableness" when measured against "prevailing professional norms." *See Strickland*, 466 U.S. at 687–88. Because of the "variety of circumstances" and "the range of legitimate decisions regarding how best to represent a criminal defendant," our review of counsel's actions is "highly deferential." *Id.* at 688–89. We judge the reasonableness of counsel's actions "on the facts of the particular case, viewed as of the time of counsel's conduct," *id.* at 690, and we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689. One way to overcome this strong presumption is for a defendant to persuade the court that there was "no conceivable tactical basis" for counsel's actions. *State v. Clark*, 2004 UT 25, ¶ 7, 89 P.3d 162 (quotation simplified). "Only when no reasonable attorney would pursue the chosen strategy will we determine that counsel has been constitutionally ineffective." *State v. Roberts*, 2019 UT App 9, ¶ 29, 438 P.3d 885 (quotation simplified).

¶27    With regard to his argument that the jury instructions did not sufficiently identify the time frames within which the crimes allegedly occurred, Popp cannot satisfy the first part of the *Strickland* test, because the jury instructions correctly stated the

law in this regard, and "[f]ailure to object to jury instructions that correctly state the law is not deficient performance." *State v. Lee*, 2014 UT App 4, ¶ 22, 318 P.3d 1164. Under Utah law, a person commits sodomy upon a child if he intentionally, knowingly, or recklessly "engages in any sexual act upon or with a child who is under the age of 14, involving the genitals or anus of the actor or the child and the mouth or anus of either person, regardless of the sex of either participant." Utah Code Ann. §§ 76-2-102, 76-5-403.1(1) (LexisNexis 2017). "[A]ny touching, even if accomplished through clothing, is sufficient." *Id.* § 76-5-407(3) (Supp. 2019). The instructions Popp assails apprised the jury that the State bore the burden of proving, "beyond a reasonable doubt," that (1) Popp "intentionally, knowingly, or recklessly committed a sexual act with F.H. involving any touching, however slight, of the genitals of one person and the mouth or anus of another, even if accomplished through the clothing;" and (2) "F.H. was under the age of 14 years old at the time of the conduct." In addition, the jury was instructed that, for each of the two counts, Popp was charged with engaging in the acts "on or about January 2012 through December 2013."

¶28   Popp's argument that these instructions were flawed because they did not specify "when the conduct occurred" is unpersuasive. The relevant instructions tracked the language of the statute and therefore "accurately convey[ed] the law." *See State v. Maama*, 2015 UT App 235, ¶ 29, 359 P.3d 1272. Specifically, the instructions included an age element, making clear that the State needed to prove that "F.H. was under the age of 14 years old at the time of the conduct." Moreover, even though time is not an element of the offense of sodomy on a child and therefore need not be included in the instructions,[4] *see*

---

4. Popp acknowledges that "time is not always a statutory element of an offense," but asserts that time must be an element

(continued…)

Utah Code Ann. § 76-5-403.1(1), these instructions did include a time element, specifying the period of time ("on or about January 2012 through December 2013") in which F.H. claimed that the conduct had occurred. Popp has not pointed to any requirement that the State prove that this type of crime occurred on a specific date at a specific time. Accordingly, these instructions were not infirm with regard to the time frame issue, and because any objection counsel might have raised in this regard would have been overruled, counsel did not perform deficiently by electing not to raise one. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

¶29 Popp's second argument—that "neither the instructions nor the verdict form denote the specific act or conduct for which the jury . . . found guilt"—fails because Popp cannot show prejudice, even if one assumes for the purposes of the argument that the instructions and verdict form were insufficient in this regard. To establish prejudice, Popp must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The failure of the instructions and the verdict form to specify which count went with the "frosting" episode and which count went with the "bottle" episode did not matter in this case, where

---

(…continued)

of the offenses with which he was charged, because the age of the victim may alter the level of offense, *see* Utah Code Ann. § 76-1-501(2)(a) (LexisNexis 2018) (stating that an "element of the offense" includes "the conduct, attendant circumstances, or results of conduct proscribed, prohibited, or forbidden in the definition of the offense"); *see also State v. Fulton*, 742 P.2d 1208, 1213 (Utah 1987).

F.H. described only two incidents and Popp was charged with only two counts and convicted of both.

¶30    Because Popp can satisfy neither part of the *Strickland* test, his claim that his attorney performed deficiently by failing to object to jury instructions is without merit.

## II. CJC Interview

¶31    Next, Popp contends that the CJC Interview should not have been shown to the jury. Popp acknowledges that the only objection he ever lodged to the admission of the CJC Interview—that its admission would infringe on his right to confront witnesses—was withdrawn after it became clear that F.H. would indeed be available for cross-examination, and that his appellate arguments on this point are therefore unpreserved. Nevertheless, Popp asks us to review this issue for plain error and ineffective assistance of counsel.

### A.    Plain Error

¶32    Popp contends that the trial court plainly erred by failing to evaluate the reliability of the CJC Interview as required by rule 15.5(a)(8) of the Utah Rules of Criminal Procedure. As with the previous claim, the State counters that plain error review of this claim is not available because Popp invited any error by withdrawing his objection at the pretrial hearing to admission of the CJC Interview.

¶33    But we do not think that Popp's conduct with regard to this claim constitutes invited error. As noted above, to invite error, a party must do more than simply fail to object; rather, a party must make some affirmative representation to the court that it is proceeding correctly. *Pratt v. Nelson*, 2007 UT 41, ¶¶ 18–22, 164 P.3d 366; *see also State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 (stating that, to invite error, counsel must "affirmatively represent[] to the trial court that he or she had no

objection to the proceedings" (quotation simplified)). "Examples of affirmative representations include where counsel stipulates to the court's instruction, states directly that there is no objection to a specific ruling of the court, or provides the court with erroneous authority upon which the court relies." *State v. Cooper*, 2011 UT App 234, ¶ 10, 261 P.3d 653 (quotation simplified). In this vein, there is "a distinction between affirmative actions to initiate the error and merely acquiescing to the error." *See State v. McNeil*, 2016 UT 3, ¶ 18, 365 P.3d 699 (quotation simplified); *see also State v. Marquina*, 2018 UT App 219, ¶ 23, 437 P.3d 628 (noting that our supreme court "has previously rejected attempts to broaden the scope of the invited error doctrine beyond this affirmative-representation model"), *cert. granted*, 440 P.3d 691 (Utah 2019). Where no affirmative representation is made, and counsel simply fails to object, any error "is not invited but merely unpreserved, and thus remains subject to plain error review." *McNeil*, 2016 UT 3, ¶ 21.

¶34 Here, Popp made a single objection to admission of the CJC Interview based on the confrontation clause, then withdrew that objection after learning that F.H. would be present to testify at trial. Further, Popp never manifested affirmative consent to the admissibility of the CJC Interview under rule 15.5(a) of the Utah Rules of Criminal Procedure, or made any affirmative representation that it was reliable evidence. Popp simply withdrew his confrontation clause objection. In our view, where the admissibility of the CJC Interview under rule 15.5(a) was not the subject of Popp's withdrawn objection, this situation is materially indistinguishable from a situation in which a litigant does not object at all, and it is well settled that a simple failure to object does not constitute invited error. *See id.* (stating that a simple failure to object means that the argument is unpreserved, not that an error has been invited). Accordingly, we reject the State's argument that Popp invited any error in the admission of the CJC Interview under rule 15.5(a), and proceed to evaluate Popp's unpreserved claim under a plain error standard.

¶35 To prevail on a claim that the trial court plainly erred in admitting the CJC Interview, Popp "must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *See State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (quotation simplified). Popp asserts that the trial court erred in allowing the jury to view the CJC Interview without first assessing its reliability under rule 15.5. He asserts that this error was obvious because the "requirement for the trial court to evaluate reliability is plain in Rule 15.5 and relevant case law." And he maintains that this failure was harmful here because the CJC Interview was both unreliable and an important part of the State's case.

¶36 Because Popp must satisfy all three requirements to succeed on his claim, *see id.*, if we conclude that the alleged error was not harmful we need not analyze whether it was obvious, *see State v. Saenz*, 2016 UT App 69, ¶ 12, 370 P.3d 1278 ("If there is no prejudice, we have no reason to reach the other elements of the plain error analysis." (quotation simplified)). "An error is harmful if, absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, if our confidence in the verdict is undermined." *State v. Bond*, 2015 UT 88, ¶ 49, 361 P.3d 104 (quotation simplified). Based on the record before us, we conclude that, even if the trial court erred by failing to strictly comply with rule 15.5, Popp has not demonstrated how this error was harmful.

¶37 First, there is not a reasonable likelihood that the outcome of the trial would have been different had the CJC Interview been excluded. F.H. was available to—and did—testify at trial and there is nothing in the record to suggest that, if the CJC Interview had been excluded, F.H. would have been unable to testify live as to the events in question. Indeed, during her trial testimony, F.H. affirmed that the events described in the video recording did in fact occur. Furthermore, after viewing the video, F.H. reiterated that Popp had asked her to lick his penis

on two occasions—once under the guise of licking frosting off of a spoon and once under the guise of cleaning bottles.

¶38    Second, Popp has not carried his burden to prove that—even if a timely objection had been lodged and the trial court had conducted a rule 15.5 reliability review—the court would have excluded the video as unreliable. Popp contends that several factors undermine the reliability of the CJC Interview. Specifically, he asserts that Investigator failed to establish a baseline of truth versus lie; that she did not elicit a promise from F.H. to tell the truth; that she asked F.H. leading questions; and that she asked F.H. if anyone told F.H. what to say in the interview. We do not think these factors would have resulted in exclusion of the video, especially in light of the unrebutted testimony from both Investigator and Detective that the CJC Interview was conducted appropriately and according to national guidelines. In determining reliability in the rule 15.5 context, the court must "assess the interview in all of its circumstances." *State v. Roberts*, 2019 UT App 9, ¶ 21, 438 P.3d 885. Indeed, we have recognized that there is not "one 'right' way to conduct an interview," and that a court's decision to assign more weight to a victim's responses than to an alleged flaw in the interviewing technique "does not, without more, render its reliability determination erroneous." *Id.* Popp has not persuaded us that, on this record, the perceived flaws would have rendered the CJC Interview unreliable.

¶39    In sum, Popp has not demonstrated that he was harmed by any error the trial court might have made by failing to conduct a rule 15.5 reliability determination prior to admitting the CJC Interview. Accordingly, we cannot conclude that the trial court plainly erred.

B.    Ineffective Assistance

¶40    Next, Popp contends that trial counsel's failure to challenge the admissibility of the CJC Interview on reliability

grounds constituted ineffective assistance of counsel. As noted above, one of the two elements that Popp must establish, in order to demonstrate that his counsel performed ineffectively, is prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (stating that, to establish a claim of ineffective assistance, a defendant "must show that counsel's performance was deficient" and that "the deficient performance prejudiced the defense"). However, our supreme court has "held that the prejudice test is the same whether under the claim of ineffective assistance or plain error." *McNeil*, 2016 UT 3, ¶ 29; *see also State v. Bair*, 2012 UT App 106, ¶ 35, 275 P.3d 1050 ("The 'harm' factor in the plain error analysis is equivalent to the prejudice test applied in assessing claims of ineffective assistance of counsel." (quotation simplified)). Consequently, "failure to meet the plain error requirement of prejudice means that [the] defendant likewise fails to meet the required showing under the ineffective assistance of counsel standard." *State v. Cheek*, 2015 UT App 243, ¶ 32, 361 P.3d 679 (quotation simplified). Therefore, Popp's ineffective assistance claim founders on the same shoals as his plain error claim does.[5]

---

5. On this point, we do not think that Popp can demonstrate deficient performance either, because he cannot "rebut the strong presumption that under the circumstances the challenged action might be considered sound trial strategy." *See State v. Wright*, 2013 UT App 142, ¶ 13, 304 P.3d 887 (quotation simplified). We perceive possible tactical reasons why counsel may have wanted the CJC Interview to be admitted. First, counsel might have believed that F.H.'s live testimony would have been even more powerful than recorded testimony. Second, the CJC Interview contained some discussion of items helpful to the defense, including Popp's theory that Mother had coached F.H. into making the abuse allegations as a way to gain custody and terminate child support payments to Popp.

III. Pre-Arrest Right to Remain Silent

¶41     Popp next argues that his constitutional right to remain silent was violated when Detective testified at trial about Popp's refusal to submit to a pre-arrest interview. Popp contends that Detective's testimony caused the jury to infer that Popp had "something to hide" from police and that Popp's silence was "evidence of guilt." Like Popp's first two claims on appeal, this one is also unpreserved, and Popp again asks us to review this claim for plain error and ineffective assistance of counsel.

A.      Plain Error

¶42     Popp contends that the trial court plainly erred when it allowed Detective to testify that Popp had declined the opportunity to speak with police prior to his arrest. Popp further contends that the court did not properly instruct the jury, when it posed a question during deliberation, that Popp's pre-arrest silence cannot be used as evidence of guilt. Any error in the court's response to the jury's question was invited by Popp, and—even assuming that Popp did not invite any error in the admission of the evidence—the trial court did not plainly err in allowing Detective to testify about his interactions with Popp.

¶43     As explained above, a party invites error when it "independently ma[kes] a clear affirmative representation" to the court that the court is proceeding appropriately. *State v. McNeil*, 2016 UT 3, ¶ 18, 365 P.3d 699. With regard to the court's response to the jury's question, Popp invited any error. During its deliberation, the jury sent a question to the court about Detective's testimony, asking, "Did the detective tell [Popp] why they wanted to interview him?" In chambers, counsel for both sides discussed how to respond to the question. Popp's counsel suggested that the court respond by telling the jurors "that they have the evidence, they have to make a decision based on what they heard." The State and the court agreed with that suggestion, and together the parties and the court determined

that "the safest thing to do" would be to refer the jury to three specific jury instructions, which state that one duty of the jury "is to determine the facts of the case from the evidence received in the trial and not from any other source." Here, counsel did more than simply respond to a question from the court about whether he had any objection to a plan formulated by someone else; in this instance, the court's response to the jury's question was framed by Popp's counsel's own suggestion. Popp therefore invited any error in that response. *See id.* ("[W]e have traditionally found invited error when the context reveals that counsel independently made a clear affirmative representation of the erroneous principle.").

¶44    We are unable to conclude, however, that Popp invited any error in the trial court's admission of Detective's testimony. Although Popp's counsel was directly queried about whether he had any "comment" on the State's request to have Detective testify about his interactions with Popp, and responded in the negative, we are uncertain whether, under operative supreme court case law, such conduct amounts to invited error in this context. As noted above, *supra* ¶ 23, our supreme court has clearly held that a defendant who is specifically queried about a jury instruction and affirmatively responds that he has no objection is deemed to have invited any error in that jury instruction. *See, e.g., Geukgeuzian*, 2004 UT 16, ¶¶ 9–11; *State v. Hamilton*, 2003 UT 22, ¶ 54, 70 P.3d 111. Our supreme court has extended this concept to the jury selection context as well. *State v. Winfield*, 2006 UT 4, ¶¶ 16, 18, 128 P.3d 1171 (holding that a defendant invited any error in the jury selection process by affirmatively stating, in response to a question from the court, that he had no objection to the composition of the jury). But more recently, in *State v. McNeil*, our supreme court—without citation to *Geukgeuzian* or *Winfield*—appeared to directly repudiate the logic of those cases, at least in the context of admission of evidence. 2016 UT 3, ¶ 21 (rejecting the State's argument "that if counsel does not offer a proper objection [to

the admission of evidence] when asked to do so by the trial court, the error is invited," and stating that it found that argument "unpersuasive").[6] In light of *McNeil*, we find it most efficient here to simply assume, for purposes of our analysis, that Popp did not invite any error in the trial court's admission of Detective's testimony, and to evaluate the trial court's decision for plain error.

¶45    And in this case, the trial court did not plainly err in allowing Detective to testify about his interactions with Popp, including testifying that Popp declined his invitation to sit for an interview. As noted above, in order to prevail on a claim that the trial court plainly erred in allowing Detective's testimony, Popp "must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (quotation simplified). We do not discern any error in admission of Detective's testimony, let alone an obvious one.

¶46    It is certainly true that "a person is protected from compelled self-incrimination at all times, not just upon arrest or during a custodial interrogation," *State v. Gallup*, 2011 UT App

_____

6. The court did not explain why it found that argument "unpersuasive" in *McNeil* but entirely persuasive in *Geukgeuzian*, *Hamilton*, and *Winfield*, and did not attempt to distinguish those cases in *McNeil*. As we read all of the cases together, under current law a litigant who fails to object after being directly asked about a jury instruction or about the composition of the jury will be deemed to have invited any error, while a litigant who fails to object after being directly asked about the admissibility of evidence will not be. However, such distinctions are not outcome-determinative in this case, because Popp's claim regarding the admission of Detective's testimony fails even under plain error review.

422, ¶ 15, 267 P.3d 289 (quotation simplified), and that evidence of a defendant's pre-arrest silence may not be used at trial "to infer [that the] defendant exhibited a consciousness of guilt," *State v. Palmer*, 860 P.2d 339, 349 (Utah Ct. App. 1993). But the "mere mention of a defendant's exercise of his rights does not automatically establish a violation." *State v. Maas*, 1999 UT App 325, ¶ 20, 991 P.2d 1108 (quotation simplified). "Rather, it is the prosecutor's exploitation of a defendant's exercise of his right to silence which is prohibited." *Id.* (quotation simplified). To discern the difference between permissible uses and constitutional violations, "a court must look at the particular use to which the disclosure is put, and the context of the disclosure." *Id.* ¶ 21. A violation occurs when the State frames the issue in a way that "raises the inference that silence equals guilt." *Id.* ¶ 20.

¶47    Here, the State did not attempt to use Detective's testimony to "cast the forbidden inference that [Popp's] silence equaled guilt." *See id.* ¶ 25. Instead, the State introduced the evidence to rebut Popp's theory that Detective too readily accepted F.H.'s version of events, and that he did not adequately investigate the case. Testimony elicited from Detective was used to demonstrate that Detective had at least attempted to interview all relevant witnesses—including Popp—and had done "everything he could to . . . investigate the case." The State carefully limited its use of this evidence to this purpose, and (as it promised) did not refer in closing argument to Detective's testimony about Popp's ultimate refusal to interview. Under these circumstances, we cannot say that the State introduced Detective's testimony in order to raise a forbidden inference, and therefore the trial court did not commit error—let alone a plain one—by allowing Detective's testimony.

B.    Ineffective Assistance

¶48    Next, Popp contends that his trial counsel was ineffective for failing to object to Detective's testimony or to request a

curative instruction. As indicated above, to succeed on an ineffective assistance claim, a defendant must demonstrate that his counsel performed deficiently and that counsel's deficient performance prejudiced him. *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. Failure to satisfy either part of the ineffective assistance test is fatal to a defendant's claim. *Archuleta v. Galetka,* 2011 UT 73, ¶ 41, 267 P.3d 232. Because Popp has not shown that counsel performed deficiently by not objecting to Detective's testimony or asking for a curative instruction, this claim fails.

¶49 Under the circumstances presented, we are not convinced that a timely objection to the admission of Detective's testimony would have been granted. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel."). As noted immediately above, we discern no error in the trial court's admission of Detective's testimony about Popp's refusal to interview, and we are therefore unpersuaded that the trial court would have granted an objection even if counsel had raised one.

¶50 Likewise, Popp has not carried his burden of demonstrating that trial counsel was ineffective for failing to request a curative instruction in response to the jury's question. Utah courts have long recognized that counsel's decision not to request an available curative instruction may be "construed as sound trial strategy." *State v. Harter*, 2007 UT App 5, ¶ 16, 155 P.3d 116. Indeed, a curative instruction may actually serve to draw the jury's attention toward the subject matter of the instruction and further emphasize the issue the instruction is attempting to cure. *State v. Garrido*, 2013 UT App 245, ¶ 26, 314 P.3d 1014 ("Choosing to forgo a limiting instruction can be a reasonable decision to avoid drawing attention to unfavorable testimony."). Therefore, "any advantage [Popp] may have gained by requesting a curative . . . instruction may have been offset by the attention drawn to" Popp's silence. *See Harter*, 2007 UT App 5, ¶ 16.

¶51    Accordingly, Popp has not demonstrated that his counsel acted deficiently by failing to object to Detective's testimony or to request a curative instruction. Consequently, we reject Popp's ineffective assistance of counsel claim with respect to this issue.

## IV.  Motion for Rule 23B Remand

¶52    In addition to the claims he raises based on the appellate record, Popp filed a motion under rule 23B of the Utah Rules of Appellate Procedure, seeking an order remanding the case to the trial court for further proceedings regarding three of his ineffective assistance claims. Our supreme court has noted that, where "the record is silent regarding counsel's conduct," a defendant will not be able to meet his burden of "pointing to specific instances in the record demonstrating both counsel's deficient performance and the prejudice it caused." *State v. Griffin*, 2015 UT 18, ¶ 16, 441 P.3d 1166. Rule 23B was "specifically designed" to remedy this problem. *Id.* ¶ 17 (quotation simplified). Under rule 23B, a defendant "may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a).

¶53    A movant must make a four-part showing in order to obtain a remand order under rule 23B. First, the rule 23B motion "must be supported by affidavits setting forth facts that are not contained in the existing record." *State v. Norton*, 2015 UT App 263, ¶ 6, 361 P.3d 719 (quotation simplified). Second, the affidavits must contain "allegations of fact that are not speculative." *Id.* (quotation simplified). Third, the allegations contained in the affidavits "must show deficient performance by counsel." *Id.* (quotation simplified). And finally, the affidavits "must also allege facts that show the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." *Id.* (quotation simplified). Importantly,

the third and fourth elements require the defendant to "present the court with the evidence he intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." *State v. Gallegos*, 2018 UT App 192, ¶ 23, 437 P.3d 388 (quotation simplified), *cert. granted*, 437 P.3d 1248 (Utah 2019). "[I]f the defendant could not meet the test for ineffective assistance of counsel, even if his new factual allegations were true, there is no reason to remand the case, and we should deny the motion." *Griffin*, 2015 UT 18, ¶ 20.

¶54 Popp asserts that remand under rule 23B is necessary to supplement the record to support three of his claims that his trial counsel rendered ineffective assistance. First, Popp contends that trial counsel failed to investigate and call three potential defense witnesses. Second, Popp asserts that trial counsel failed to consult with and call an expert to challenge the reliability of the CJC Interview. Third, Popp faults trial counsel for failing to object to and rebut testimony from Detective. We examine each of these claims in turn.

A. Failure to Investigate and Call Defense Witnesses

¶55 First, Popp seeks remand related to a claim—that he concedes he cannot fully support on the current record—that his attorney was ineffective for failing to investigate and call three potential defense witnesses. He contends that he told counsel about these witnesses prior to the witness disclosure deadline, but that counsel failed to act on the information received. Popp contends that counsel's conduct was "objectively unreasonable and left Popp without any evidence supporting his version of events." We conclude that Popp has satisfied the requirements of rule 23B on this claim.

¶56 To support his motion, Popp submitted his own affidavit, as well as affidavits from Grandmother, Popp's Friend, and Mother's Friend. In his own affidavit, Popp avers that he gave counsel the names and contact information for a number of

potential trial witnesses, including each of the other three rule 23B affiants, "in late November" 2017, a few weeks before the witness disclosure deadline. All three of the other affiants swear that Popp's attorney did not contact them. Popp avers that he and Grandmother met with counsel on December 28, 2017, and again gave him the names of potential witnesses, an account corroborated by Grandmother, yet counsel still did not contact any witnesses. As noted above, due to counsel's late disclosure of his intent to call Grandmother, Popp's Friend, and Mother's Friend, counsel acceded to a "compromise" in which he agreed not to call these witnesses unless the State opened the door by discussing changes in F.H.'s behavior. But Popp now argues, and the witnesses' affidavits support, that these witnesses could have testified to a number of other issues, including: (1) that Popp had a reputation for honesty while Mother did not; (2) that Popp was a good father; (3) that Mother allowed F.H. to watch sexually explicit television shows; (4) that F.H. did not know Popp was not her biological father until she moved in with Mother after the divorce; (5) that Mother was highly motivated to gain full custody of the children and terminate child support payments to Popp; and (6) that other adults had often been present in the house with F.H. and Popp during the times of day in which the abuse was alleged to have occurred. All of this evidence would have been supportive of Popp's defenses, including his main theory at trial: that Mother had coached F.H. to testify that Popp had abused her, in order for Mother to gain an advantage in the contentious custody proceedings.

¶57 Under these circumstances, Popp has met all four prerequisites for the granting of a rule 23B motion. He has submitted affidavits setting forth non-speculative facts not currently contained in the existing record, and those facts, if proven true, could potentially support both parts of an ineffective assistance of counsel claim. We already know from the record that trial counsel failed to meet the court's witness disclosure deadline, and was thereby hamstrung in his ability to

call later-disclosed witnesses. From the affidavits Popp has submitted in connection with his rule 23B motion, we have learned who these witnesses are, what they would have testified about, that Popp disclosed this information to trial counsel in advance of trial and the witness disclosure deadline, and that their testimony might have been useful to Popp. Based on the information before us, we conclude that these facts, if true, "could support a determination that counsel was ineffective." *See* Utah R. App. P. 23B(a).

¶58   The State argues, however, that the testimony Popp claims should have been presented would not have been enough to make a difference, and that Popp therefore cannot demonstrate the potential for prejudice. Although we acknowledge that this is a close question, we resolve it here in favor of Popp. As noted above, prejudice in this context refers to a "reasonable probability" that the result of the trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). This standard is less exacting than "the more demanding 'more likely than not' standard." *Tillman v. State*, 2005 UT 56, ¶ 29 n.7, 128 P.3d 1123 (quoting *Strickler v. Greene*, 527 U.S. 263, 297–300 (1999) (Souter, J., concurring and dissenting)), *superseded in part by statute on other grounds as stated in Gordon v. State*, 2016 UT App 190, 382 P.3d 1063. The reasonable probability standard is "more akin to a significant possibility of a different result." *Tillman*, 2005 UT 56, ¶ 29 n.7 (quotation simplified). There is a "reasonable probability of a different result" when a court's "confidence in the outcome of the trial" is undermined. *Id.* ¶ 29 (quotation simplified); *see also Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

¶59   In this case, neither side presented any physical evidence; indeed, the entire case hinged on the credibility of the witnesses, especially F.H. While Popp's counsel did cross-examine all of the State's witnesses, including F.H., Popp called only himself as a

witness, and he testified for about ten minutes. While Popp denied, under oath, any abuse of F.H., no other defense witness was called to corroborate any portion of Popp's account, or to bolster his theory that Mother may have coached F.H. to make the accusations. All three of the rule 23B affiants (Grandmother, Popp's Friend, and Mother's Friend) could have lent support in that regard, especially Mother's Friend, who states in her affidavit, among other things, that she is of the view that Mother "is not trustworthy" and that F.H.'s "allegations were orchestrated by [Mother] as a way to gain custody" and to avoid paying Popp child support. At a minimum, calling these witnesses would have made it less likely that jurors would draw the conclusion—as they may have after witnessing a ten-minute defense in a first-degree felony case—that Popp did not have much of a defense to offer. In the end, if the facts are borne out to be as the rule 23B affidavits make them appear, our confidence in the outcome of the trial could be sufficiently undermined such that the second element of the *Strickland* test may be met.

¶60 Therefore, we grant Popp's rule 23B motion on this claim.

B.      Failure to Challenge Reliability of CJC Interview

¶61 Popp next claims that his trial counsel was ineffective for failing to consult and call an expert to challenge the reliability of the CJC Interview. We have already addressed and rejected this claim, as it relates to evidence currently in the record. *See supra* Part II.B. Popp asserts that he might be able to make out a valid claim for ineffective assistance on this point, if he could obtain a remand for further proceedings. To support this claim, Popp submits multiple affidavits, including one from a potential expert witness. On this point, however, the affidavits Popp submits do not support a rule 23B remand, because even if the new factual allegations are true, Popp has not shown prejudice.

¶62 In our view, this claim is doomed by the details of the potential expert's affidavit. Specifically, the expert avers that

Popp's trial counsel contacted him, prior to trial, and asked him to review the audio recording of the CJC Interview and to "identify any potential problems contained therein." After listening to the recording, the expert concluded that there was nothing "exceptionally unusual or untoward" in the interview, and that he "did not identify anything significantly problematic in the interview in reference to techniques that would be inconsistent with sound interview protocol." The expert avers that he shared those views with trial counsel in a telephone conversation prior to trial, and that counsel responded by stating, "[T]hat's kind of what I thought."

¶63    Under these circumstances, the affidavits submitted by Popp in support of his request for rule 23B remand on this claim are insufficient. Even if counsel had called the potential expert to testify about the reliability of the CJC Interview, the materials Popp has submitted give us no reason to believe that the court would have been any more likely to exclude the CJC Interview, or that there would have been a reasonable probability that the result of Popp's trial would have been different. Accordingly, we see no purpose for a rule 23B remand on this claim.

C.    Failure to Object to Detective's Testimony

¶64    Finally, Popp claims that his trial counsel was ineffective for failing to object to and rebut Detective's testimony—which Popp characterizes as "unnoticed expert testimony"—about the propriety of the CJC Interview. He asserts that, had counsel objected, Popp may have been able to win exclusion of Detective's testimony regarding the CJC Interview. Moreover, he asserts that, even if he could not have obtained an order excluding Detective's testimony, counsel should have at least called an expert to rebut it.

¶65    We conclude that, on the facts presented, Popp has not demonstrated entitlement to a rule 23B remand on this claim. After consulting with the expert witness discussed in the

previous section, counsel may have reasonably concluded both (a) that objecting to Detective's testimony would be unnecessary and futile, and (b) that calling a rebuttal expert would simply result in bolstering Detective's testimony that the CJC Interview was conducted appropriately. Indeed, as discussed above, Popp's own potential expert listened to a recording of the CJC Interview and concluded that there did not exist grounds to challenge its admission on the basis that it had been conducted inappropriately. Consequently, even if the information in Popp's rule 23B affidavits is true, Popp will not be able to demonstrate that his attorney performed deficiently in this regard, and therefore Popp's request is insufficient to justify a remand. *See Griffin*, 2015 UT 18, ¶ 19.

CONCLUSION

¶66 We reject all of Popp's claims that the trial court erred, as well as all of Popp's claims for ineffective assistance that are based on the appellate record. In addition, we reject two of Popp's requests for remand under rule 23B, and deny his rule 23B motion with respect to those claims. However, we grant Popp's rule 23B motion regarding his claim that trial counsel was ineffective for failing to investigate or call three potential defense witnesses. Therefore, we remand the case to the trial court to supplement the record as necessary to resolve this claim, including exploration of the following issues:

(a) Whether Popp made counsel aware of potential trial witnesses prior to the witness disclosure deadline;

(b) If so, whether counsel contacted those witnesses, or otherwise investigated their potential testimony, and, if not, whether counsel had valid strategic reasons for declining to do so;

(c) What testimony those witnesses would have given, whether that testimony might have been helpful to Popp's defense, and whether that testimony might have been significantly undermined through cross-examination.

———