**2025 UT App 154**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF P.M.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

M.M.,
Appellant,
*v.*
STATE OF UTAH AND O.D.M.,
Appellees.

Opinion
No. 20240242-CA
Filed October 23, 2025

Third District Juvenile Court, Salt Lake Department
The Honorable Aaron Flater
No. 1225905

Colleen K. Coebergh, Attorney for Appellant

Derek E. Brown, Deborah A. Wood, and John M.
Peterson, Attorneys for Appellee State of Utah

Martha Pierce, Alisha Giles, and Heath Haacke,
Guardians ad Litem

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 M.M. (Mother) and O.D.M. (Father) are the parents of P.M. (Child). While traveling in Utah with Child, Mother was involved in an incident that resulted in her involuntary commitment. Father was not with Mother at the time of the incident, and Child was taken into protective custody. The State filed a verified child welfare petition alleging that Child was abused, neglected, or

dependent as to both Mother and Father. Approximately seven months after the petition was filed, the juvenile court held an adjudication hearing on the petition, thereafter entering an order adjudicating Child dependent as to Mother.[1]

¶2     Mother now appeals the juvenile court's dependency adjudication, arguing that the court unlawfully delayed the adjudication hearing and that the court abused its discretion in admitting certain evidence during the adjudication hearing. As part of both arguments, Mother asserts that her due process rights were violated. We disagree and affirm.


BACKGROUND

¶3     Child was born in March 2023, in Idaho. At the time of Child's birth, Mother and Father (collectively, Parents) lived together in Idaho.

¶4     On May 24, 2023, Father left Idaho for a short trip to Texas. After he left, Mother felt threatened by people in her community, so she decided to leave Idaho to get away from the situation.

¶5     On June 9, 2023, Mother arrived at the airport in Salt Lake City, Utah, where she wanted to purchase a plane ticket to Texas to meet Father. After speaking with an airport employee, Mother was informed that she could not purchase a ticket for Child because she did not have the necessary paperwork. Thereafter, the employee called the police, and officers and a case manager arrived on scene. None of the officers spoke Spanish—which is the only language Mother speaks—although the case manager

---

1. Child was also adjudicated dependent as to Father based on the same events giving rise to this case, and Father has separately appealed the juvenile court's adjudication order. *See In re P.M.*, 2025 UT App 155. In this opinion, we resolve only Mother's appeal.

spoke Spanish. Based on her conversation with Mother, the case manager believed Mother was in an abusive relationship with Father and was fleeing from him. The case manager worked to transfer Mother to a local shelter, but because all the shelters were full, Mother was taken to a nearby hotel.

¶6      At approximately 2:00 a.m. on June 10, two officers (Officer 1 and Officer 2) were dispatched to the hotel on a report that an unknown female was having a "problem." Neither officer spoke fluent Spanish, although Officer 2 spoke "a bit."

¶7      When the officers arrived at the hotel, they activated their body cameras. They observed Mother standing in the hotel lobby holding Child. Mother was "screaming or yelling at a high tone of voice," and she was not wearing a shirt, just a bra. A second female was seated in a chair near Mother. She was holding an ice pack to her face, and she alleged that Mother had hit her "in the face for no apparent reason."

¶8      After trying to ascertain what had happened in the lobby, the officers decided it would be best for Mother to return to her room. The officers asked Mother to do so, but she did not comply with the request because, as the officers understood it, she believed the room was "dangerous."

¶9      Based on the "erratic behavior" the officers had observed, they concluded that Mother was a danger to herself or others and that she met the criteria necessary to involuntarily commit her to the hospital. But when the officers attempted to take Mother into custody, she "became combative" and would not allow the officers to take Child. The officers quickly became concerned for Child's safety due to the way that Mother was holding her. Officer 1 saw that Mother "began to wrap her arm near [Child's] neck area and squeeze rather tightly." He was concerned because this grip can "ultimately stop the blood flow in the carotid arteries if applied correctly" and, if held too long, it can lead to

"unconsciousness" or "death." And Officer 2 also realized that Mother was holding Child "in an unsafe manner" by "pulling [Child] tighter towards herself, almost by the crook of her neck." In light of the foregoing, Officer 1 used his taser to stun Mother so that Child could be retrieved safely. After being removed from Mother, Child was placed into temporary emergency protective custody, and Mother was involuntarily committed to a hospital in Salt Lake City.

¶10 The following day, June 11, Father arrived in Utah. Father was not contacted regarding Child or Mother or their whereabouts, so he left Utah approximately twenty-four hours after his arrival and returned to the family's residence in Idaho. Once in Idaho, Father contacted the police and searched "everywhere" for Mother. On June 12, Mother was released from the hospital and moved into a local women's shelter in Salt Lake City.

¶11 On June 13, the State filed a verified child welfare petition alleging that Child was abused, neglected, or dependent when Mother was involuntarily committed and the Division of Child and Family Services (DCFS) was unable to contact Father.

¶12 On June 16, the matter came before the juvenile court for a shelter hearing. Mother and Father were present at the hearing. During the hearing, Father informed the court that the family resided in Idaho. Mother's counsel (Counsel) stated that because the family lived in Idaho and Child had no "ties or connection" with Utah, Child's home state for purposes of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) was Idaho, and the Utah court "only ha[d] emergency jurisdiction." *See generally* Utah Code § 81-11-204(1) ("A court of this state has temporary emergency jurisdiction if the minor child is present in this state and the minor child has been abandoned or it is necessary in an emergency to protect the minor child . . . ."). Parents requested that the court return Child to their custody so

that the family could return to Idaho. In the alternative, Mother asked that the court order an expedited investigation and determination under the Interstate Compact on Placement of Children (ICPC) to determine whether placement with Parents in Idaho was appropriate.

¶13   The State opposed Parents' request that Child be returned to them and asked the juvenile court to continue Child's removal. Regarding Father, the State explained that it had no contact with him until the night before the hearing and that there had not been adequate time to evaluate whether his home in Idaho was an appropriate placement for Child. Moreover, the State noted that Mother had raised domestic violence allegations against Father that had not yet been investigated. The State indicated that it had "no objection" to the court ordering an expedited ICPC investigation for Father. In response, Father argued that he was not subject to the ICPC because he is Child's natural parent, although he agreed that pursuant to Utah Code section 80-3-302 the court could order DCFS to visit his home and "check into his background to make sure there [were] no violent felonies or misdemeanors" before returning Child to his custody.

¶14   At the close of the shelter hearing, the juvenile court found that Child's initial removal was "[d]ue to an emergency situation amounting to aggravated circumstances" and that the removal was therefore "reasonable and appropriate." The court then determined that it was statutorily required to investigate Father's fitness to assume custody and to conduct a criminal background check for Father. The court accordingly ordered DCFS to contact Idaho and request a courtesy visit to Parents' home. The court continued Child's removal pending that information, reasoning as follows:

> And I'm being careful here, but I also have to find that there's a substantial risk that [Child] will suffer abuse or neglect if [she is] not removed from

> the custody of [her] parent or guardian. And I'm not sure that I've got any, other than the indication of domestic violence by [Father] against [Mother]. I'm not sure that I've got much . . . other information to believe that [Child] would suffer abuse or neglect if [she is] not removed from the custody of [Father] or perhaps even [Mother].

The court declined to rule on the applicability of the ICPC at that time but nevertheless ordered an expedited ICPC investigation "just to keep things flowing." A pretrial hearing was set for June 28.

¶15    At the June 28 pretrial hearing, the State informed the juvenile court that it had filed a report detailing DCFS's efforts to investigate Parents' residence in Idaho. At the parties' request, the court then continued the hearing to August 2.

¶16    At the continued hearing on August 2, the State informed the juvenile court that it believed Idaho was Child's home state under the UCCJEA and that Utah had only "emergency jurisdiction." The State requested to set the matter for a further pretrial hearing in "about three weeks" to allow Idaho time to file a petition. Counsel did not object and affirmatively stated that he believed the request made "the most sense" given that Parents resided in Idaho; Father's counsel took "the same position." Following this, Father informed the court that Parents had moved from Idaho to South Dakota. The pretrial review hearing was continued to August 21.

¶17    During the August 21 pretrial hearing, the parties discussed jurisdictional concerns caused by Parents' move to South Dakota. Because Parents were no longer living in Idaho, Idaho had stopped working with the State. Ultimately, all parties agreed that it was "inappropriate" to take further action until the jurisdictional questions were resolved. Counsel told the juvenile

court, "I think we need to figure out the jurisdictional issue first. I'm hesitant to adjudicate on this case or anything like that until we figure out if this case is staying here or going somewhere else . . . ." And Father's counsel stated that she "share[d] . . . the perspective of" Counsel.

¶18     At a September 11 pretrial hearing, the parties discussed UCCJEA issues. The State informed the juvenile court that an ICPC investigation with South Dakota was pending, and all parties agreed that South Dakota was the preferable jurisdiction given Parents' current location. In light of the pending ICPC investigation, the court "emphasize[d]" that it was "very important that [Parents] not move from their current location." Parents expressed frustration at how long the case was taking, but Counsel told the court, "[T]here's nothing that we can do until it's decided which Court is ultimately going to have jurisdiction." Father's counsel stated that Father was "in a similar position" as Mother.

¶19     On September 26, the juvenile court held a conference with judges from South Dakota and Idaho to discuss the issue of jurisdiction. *See generally* Utah Code § 81-11-109(2) ("A court of this state may communicate with a court in another state concerning a proceeding arising under [the UCCJEA]."). All states agreed that South Dakota would be the most appropriate forum. Father expressed that Parents wanted to remain in South Dakota and had no intention of returning to Idaho. Father therefore requested that the case be heard in South Dakota.

¶20     At a pretrial hearing on October 2, the State informed the juvenile court that it was anticipating a petition would be "filed shortly" in South Dakota. Counsel for Parents indicated that their clients wanted the case transferred to South Dakota. Counsel stated that he was "in favor of" continuing Child in DCFS custody until the petition was filed in South Dakota. Father's counsel told the court, "We are in the exact same boat . . . ."

¶21    On October 27, Parents moved from South Dakota to Utah. On November 3, the juvenile court held a pretrial hearing and UCCJEA conference with the corresponding courts in Idaho and South Dakota. Mother indicated that Parents were intending to stay in Utah so that they could "be as close as possible to" Child. Because Parents no longer resided in Idaho or South Dakota, they asked the juvenile court to take jurisdiction of the case. Thereafter, both Idaho and South Dakota declined to exercise jurisdiction, which led the court to conclude that jurisdiction was proper in Utah. *See generally id.* § 81-11-201(1) ("[A] court of this state has jurisdiction to make an initial child custody determination only if [certain conditions are met, including when] . . . a court of another state does not have jurisdiction . . . or a court of the home state of the minor child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum . . . ."). A pretrial hearing was scheduled for November 13.

¶22    During the November 13 pretrial hearing, all parties agreed to attend mediation. Mediation was ultimately unsuccessful, however, and on December 14, the parties asked the juvenile court to set the matter for a one-day adjudication hearing.

¶23    That adjudication hearing took place on January 12, 2024. At the hearing, the State sought to admit Officer 1's and Officer 2's body camera footage—which included audio—of the July 10 hotel encounter with Mother. The officers also testified as to what they observed during that encounter. Although neither officer spoke fluent Spanish, each was allowed to testify about his understanding of what Mother had been saying in Spanish. Prior to closing argument, the State withdrew the exhibits containing the officers' body camera footage.

¶24    The juvenile court adjudicated Child dependent as to both Mother and Father. At a later review hearing on October 23, 2024, Child was returned to Parents' custody, and the court's jurisdiction was terminated.

## ISSUES AND STANDARDS OF REVIEW

¶25 Mother now appeals, raising two primary issues for our review.[2] First, she argues the juvenile court erred in applying the UCCJEA, which she asserts led to an unlawful delay in adjudication that violated her due process rights. Mother acknowledges Counsel did not contest the court's application of the UCCJEA or raise concerns about due process below but asks us to consider both parts of her argument under an exception to our preservation rule. *See generally State v. Johnson*, 2017 UT 76, ¶¶ 20, 29, 416 P.3d 443 (setting forth the exceptions of plain error and exceptional circumstances); *In re A.W.*, 2018 UT App 217, ¶ 26, 437 P.3d 640 ("Utah appellate courts will not review unpreserved constitutional claims unless an exception to the preservation rule applies.").

¶26 Second, Mother takes issue with the language interpretation at the adjudication hearing. She argues that the interpretation was inadequate and that the admission of certain evidence resulted in a deprivation of her due process rights. "We will not reverse the juvenile court's rulings on evidentiary issues unless it is manifest that the juvenile court so abused its discretion that there is a likelihood that an injustice resulted." *In re M.W.*, 2016 UT App 217, ¶ 10, 387 P.3d 557 (quotation simplified).

---

2. Although this appeal is technically moot because Child has been returned to Parents' custody and the juvenile court's jurisdiction has been terminated, we agree with the parties that this case satisfies the collateral consequences exception to the mootness doctrine. *See In re M.S.*, 2023 UT App 74, ¶¶ 31–40, 533 P.3d 859. We accordingly address the merits of the appeal.

ANALYSIS

## I. Delayed Adjudication

¶27   Mother presents two related arguments concerning the timing of the adjudication hearing. First, she argues the juvenile court erred in how it applied the UCCJEA, which resulted in the unlawful delay of the adjudication hearing. Second, Mother asserts the delayed adjudication violated her right to due process. We address each argument in turn.

### A.   Application of the UCCJEA

¶28   Mother contends the juvenile court erred in how it applied the UCCJEA, which resulted in the adjudication hearing being held after the sixty-day statutory deadline specified in Utah Code section 80-3-401(2). *See* Utah Code § 80-3-401(2) ("The final adjudication hearing shall be held no later than 60 calendar days after the later of: (a) the day on which the shelter hearing is held; or (b) the day on which the abuse, neglect, or dependency petition is filed."). Mother concedes that Counsel "seemingly did not" preserve this issue for appeal and argues that Counsel "acquiesced in the delay, and did not correct the Court's misinterpretation that [the] UCCJEA did not allow the Court to adjudicate the Petition." Nevertheless, she contends that Parents' "repeated objections to delay" and requests to move the case forward were sufficient to preserve the issue. In the alternative, Mother asks us to review the issue under the plain error exception to our preservation rule.[3] The guardians ad litem counter that we

_____

3. Mother also argues the exceptional-circumstances exception to preservation is applicable. *See In re adoption of K.A.S.*, 2016 UT 55, ¶ 19, 390 P.3d 278 ("Exceptional circumstances is a doctrine that applies to rare procedural anomalies." (quotation simplified)); *accord State v. Johnson*, 2017 UT 76, ¶ 29, 416 P.3d 443. According

(continued…)

cannot reach this claim because Mother invited any error related to the delay in adjudication.[4] We agree with the guardians ad litem.

---

to Mother, the "convergence" of the juvenile court's acceptance of the State's "erroneous construction of the UCCJEA" and Counsel's "acquiescence in that misinterpretation" despite Mother's desire to regain custody constituted a rare procedural anomaly. But Mother's argument is merely a concession that Counsel invited any error in the delay, and invited error does not constitute a rare procedural anomaly. *Cf. State v. Brown*, 2019 UT App 122, ¶ 25, 447 P.3d 1250 ("Misstatements of law, far from being a procedural anomaly, are an everyday occurrence in our adversarial system. . . . A misstatement of law by one party, even if erroneously accepted by the trial court, does not generally work a manifest injustice on the other party such that the party is excused from complying with preservation rules."). Moreover, Mother has not shown how "the effects of the anomaly" warrant an exception given that custody has been restored. *See Johnson*, 2017 UT 76, ¶ 37.

4. Aside from their assertion that review of Mother's claim is precluded under the doctrine of invited error, the guardians ad litem argue that plain error review is not available in this case. *See Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶¶ 42 n.10, 44, 507 P.3d 357 (holding that "plain error review is not available in ordinary civil cases unless expressly authorized by rule," but leaving open the possibility that such review might be available in civil cases that "involve significant interests on par with those at issue in criminal cases, such as fundamental constitutional rights"). We need not resolve whether plain error review is available here, however, because even where the exception could potentially apply, Mother has failed to establish plain error, *see infra* ¶¶ 32–37, 39.

¶29 "Our doctrine of invited error is intended to prevent parties from intentionally misleading the trial court so as to preserve a hidden ground for reversal on appeal." *State v. Biel*, 2021 UT 8, ¶ 46, 484 P.3d 1172 (quotation simplified). "Under the doctrine of invited error, we have declined to engage in even plain error review when counsel, either by statement or act, affirmatively represented to the trial court that he or she had no objection to the action taken." *State v. Ringstad*, 2018 UT App 66, ¶ 58, 424 P.3d 1052 (quotation simplified).

¶30 Here, Counsel consistently urged the juvenile court to delay adjudicating the matter while questions regarding jurisdiction were resolved. Among other things, Counsel took the following actions:

- At the June 28 pretrial hearing, Counsel asked the juvenile court "to set this case over" so that he could review discovery with Mother.

- At the August 2 pretrial hearing, Counsel agreed to set the matter for a further pretrial in "about three weeks" to allow Idaho time to file a petition. At the end of this hearing, it was revealed that Parents had moved from Idaho to South Dakota.

- At the August 21 pretrial hearing, Counsel told the juvenile court, "I think we need to figure out the jurisdictional issue first. I'm hesitant to adjudicate on this case or anything like that until we figure out if this case is staying here or going somewhere else . . . ."

- At the September 11 pretrial hearing, Counsel agreed that South Dakota was the preferable jurisdiction given Parents' current location, and Counsel told the juvenile court that "there's nothing that we can do until it's decided which Court is ultimately going to have jurisdiction."

- At the October 2 pretrial hearing, Counsel stated that he was "in favor of" continuing Child in DCFS custody until a petition was filed in South Dakota.

- At the November 3 pretrial hearing, Counsel confirmed that Parents had relocated from South Dakota to Utah on October 27 and asked the juvenile court to take jurisdiction over the matter.

- At the November 13 pretrial hearing, Counsel agreed to defer the adjudication hearing until the parties could attend mediation.

- At the December 14 pretrial hearing, Counsel requested that the matter be set for a one-day adjudication hearing. The hearing was scheduled for January 12, 2024.

¶31 In sum, Mother invited any error related to the delay in the adjudication hearing when Counsel affirmatively represented to the juvenile court that Mother wanted to delay the matter. Because Mother's ongoing requests created her claim on appeal, Mother invited the error she now seeks to correct, and we are precluded from reviewing Mother's claim for plain error.

B. Due Process

¶32 Next, Mother argues that holding the final adjudication hearing after the sixty-day deadline set forth in Utah Code section 80-3-401(2) infringed on her procedural and substantive due process rights. Notwithstanding that Mother invited any error in the delay of the adjudication hearing, Mother cannot succeed on her unpreserved due process claim because she has not demonstrated plain error.

¶33 "To demonstrate plain error, [Mother] must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Johnson*, 2017 UT

76, ¶ 20, 416 P.3d 443 (quotation simplified). Because all three requirements must be met to establish plain error, "if we conclude that the alleged error was not harmful we need not analyze whether it was obvious." *State v. Popp*, 2019 UT App 173, ¶ 36, 453 P.3d 657. An error is harmful when "there is a reasonable probability that, but for the alleged error, the outcome in the case would have been different." *Johnson*, 2017 UT 76, ¶ 21 (quotation simplified).

¶34 Here, we can easily dispose of Mother's due process claim for lack of harm. The only harm that Mother points to as stemming from the delayed adjudication hearing is the depletion of the limited amount of time she was afforded by statute to reunify with Child. *See* Utah Code § 80-3-406(13)(a) ("The time period for reunification services may not exceed 12 months from the day on which the minor was initially removed . . . ."). But on the facts of this case, this is not sufficient to demonstrate harm for two related reasons.

¶35 First, Mother has successfully reunified with Child and was able to do so before the statutory deadline. Thus, even if the adjudication hearing had occurred earlier, the outcome of the case would not have been different. *See Johnson*, 2017 UT 76, ¶ 21.

¶36 Second, any delay in the adjudication hearing had no bearing on the juvenile court's decision to adjudicate Child dependent as to Mother. The court's findings were based on the events at the hotel and had nothing to do with events that occurred after Child's removal. Put differently, Child would have been adjudicated dependent as to Mother whether the hearing had been held the day after Child's removal, the date on which the hearing actually occurred, or any other date in between. Thus, Mother cannot show that but for the delay, the outcome of the case would have been different. *See id.*

¶37 Because Mother cannot show that the delay of the adjudication hearing harmed her, she cannot establish plain error.

## II. Language Interpretation

¶38 Mother next faults the juvenile court for failing to ensure there was adequate language interpretation during the adjudication hearing. To that end, she contends as an evidentiary matter that the court abused its discretion (1) by admitting Officer 1's and Officer 2's body camera footage of the incident involving Mother without an accurate interpretation of what was being said, and (2) by allowing Officer 1 and Officer 2 to testify about what Mother was saying in Spanish despite their limited understanding of Spanish. Mother further contends that both errors deprived her of due process, although she concedes that her due process argument is unpreserved. Given all the evidence presented at the adjudication hearing, we conclude that the admission of the challenged evidence was harmless and is therefore not grounds for reversal. *See In re M.W.*, 2016 UT App 217, ¶ 12, 387 P.3d 557.

¶39 "Harmless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings." *H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 44, 203 P.3d 943 (quotation simplified). Here, even without the challenged evidence, there was ample evidence supporting Mother's dependency adjudication. Wholly apart from any specific Spanish statements by Mother, the officers testified that when they arrived at the hotel, they found Mother holding Child in the lobby. Mother was "screaming or yelling at a high tone of voice," she was not dressed appropriately, and she had apparently assaulted another woman. This "erratic behavior" troubled the officers and led them to conclude that Mother was a danger to herself or others and should be involuntarily committed to the hospital. But when the officers attempted to take Mother into custody, she "began to wrap her arm near [Child's] neck area

and squeeze rather tightly." Officer 1 testified that this grip can "ultimately stop the blood flow in the carotid arteries if applied correctly" and, if held too long, it can lead to "unconsciousness" or "death." And Officer 2 agreed that Mother was holding Child "in an unsafe manner." Thus, even if Mother's statements gave rise to some initial concern on the part of the officers, it was Mother's subsequent conduct that caused the situation to escalate and ultimately resulted in the officers' need to use force. Because of this, even if the body camera footage was excluded and the officers had not been allowed to recount what they believed Mother had said in Spanish during the encounter, there is no reasonable likelihood that the result would have been different. And because no harmful error exists, Mother's related unpreserved due process claim, which she raises under a plain error argument, likewise fails. *See State v. Ray*, 2022 UT App 95, ¶ 50 n.17, 516 P.3d 329 (explaining that the plain error standard for harm "mirrors" that of the harmless error doctrine).

CONCLUSION

¶40   Mother invited any error related to the juvenile court's delay in adjudicating the verified child welfare petition, and she did not suffer harm due to the delay. And any error on the part of the court in admitting the officers' body camera footage or allowing the officers to testify at the adjudication hearing was harmless. Affirmed.

_____