2026 UT App 7

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MATTHEW ELTON,
Appellant.

Opinion
No. 20230151-CA
Filed January 23, 2026

Sixth District Court, Manti Department
The Honorable Mandy Larsen
No. 211600367

Trevor J. Lee, Attorney for Appellant

Derek E. Brown and Tera J. Peterson,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Matthew Elton was charged with child abuse with serious physical injury, aggravated assault, burglary, robbery, and violating a protective order. Elton pleaded guilty to those charges and was sentenced to prison. While those charges had been pending, the court had issued a no-contact order that prohibited him from contacting his ex-wife and their children. While incarcerated, however, Elton continued to contact them. Based on these communications, he was later charged with fifteen counts of violating a protective order. At trial, the jury convicted Elton on six counts and acquitted him of nine. Elton now appeals and raises several ineffective assistance of counsel and trial error claims. We affirm Elton's convictions for lack of prejudice.

## BACKGROUND[1]

*Elton's Prior Convictions and Entry of the No-Contact Order*

¶2 Elton and his ex-wife, Nancy,[2] divorced in 2018 after a turbulent relationship marked by domestic violence. They are the parents of four children. In October 2020, while Elton faced domestic violence and other charges, the trial court entered a pretrial no-contact order prohibiting him from contacting his son Jalen or Jalen's "family," including Nancy and the other children.[3] The order stated it would "remain in effect while the case is pending and, if applicable, while the defendant is incarcerated, on parole or on probation, unless otherwise modified in writing by the Court."

¶3 In December 2020, Elton pleaded guilty to five domestic violence offenses, globally resolving three separate cases that involved child abuse with serious physical injury, aggravated

---

1. "We recite the facts in a light most favorable to the jury verdict. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Vallejo*, 2019 UT 38, ¶ 2 n.1, 449 P.3d 39 (quotation simplified).

2. We use pseudonyms for Elton's ex-wife and children.

3. Paragraph 2 of the no-contact order states:
> The defendant shall not communicate with the victim in any way directly or indirectly. This means that the defendant shall have no contact whatsoever with the victim or any of the victim's family or household members. Contact includes, but is not limited to, communication that is in person, in writing, by telephone, text messaging, Email, any other electronic communication, or contact through a third person.

assault, burglary, robbery, and violation of an earlier protective order. In January 2021, he was sentenced to prison. The trial court did not impose any new permanent protective order at sentencing, nor did it enter any written order modifying or vacating the previously entered no-contact order.

¶4 Elton arrived in prison on February 3, 2021. From there, he sent Nancy and the children several letters and immediately began calling Nancy "nonstop." Nancy and her son Ricky spoke with Elton several times. But a phone call made to Nancy and Jalen around April 20, 2021, prompted Nancy to block Elton's calls and request help from Utah State Prison investigators to stop the calls. Thereafter, Elton continued to attempt to contact Nancy.

*The State Files Charges*

¶5 In September 2021, the State charged Elton with fifteen counts of violating a protective order between February 1, 2021, and August 1, 2021. Each charge was enhanced based on Elton's 2020 domestic violence convictions. Before trial, the State filed notice under rule 404(b) of the Utah Rules of Evidence that it intended "to introduce evidence of the defendant's prior domestic violence convictions for the purpose of proving an element of each charge"—enhancing the counts to third-degree felonies—and to prove "motive and absence of mistake."

*The Stipulated Admission of Evidence of the Prior Convictions*

¶6 At trial in November 2022, Elton's defense counsel (Counsel) stipulated to the admission of four convictions from two of Elton's 2020 cases: (1) the case involving child abuse and (2) the case involving aggravated assault, burglary, and robbery. The parties agreed that the convictions "would come in but just by admission of a certified copy of the conviction [and] not the details . . . regarding what happened."

¶7      Counsel explained that he "stipulated to the evidence of the prior convictions coming in and also not doing a motion to bifurcate" as "a strategy decision." Counsel observed that the State's evidence was inevitably "going to show that Mr. Elton was incarcerated" because he sent the letters and made the phone calls from prison. Counsel explained that by allowing the jury to know why Elton was in prison but without going into any details, the jury would be able to focus on whether Elton violated the no-contact order:

> [I]f I did not allow some explanation for what he was in prison for, then the jury would be wondering what he is in prison for. And so I believe that it is better for them to know this is what he was sentenced to prison for.
>
>         . . . And with a stipulation we mitigate some of the harmful effects of the damning testimony about specifics . . . of the crimes. And so I believe that it is more beneficial for the jury to have that answer to those questions so that they're not thinking about that; that they can concentrate on whether he violated the protective order [or] not.

¶8      Counsel opposed the admission of Elton's prior conviction for violating a protective order. Counsel conceded that there was a proper noncharacter purpose for its admission—to rebut any defense of mistake. But Counsel argued admission of the prior protective-order conviction would be unfairly prejudicial because "it's the exact same charge" and risked the jury concluding, "well, he's violated a protective order in the past, and so . . . he's violating a protective order now." The trial court ruled that it would not allow admission of Elton's conviction for violation of a protective order as part of the State's case-in-chief but would consider allowing it to be admitted in rebuttal if Elton raised a mistake defense. The State did not introduce any testimony about

the details of the prior convictions during its case. And before it rested, the State asked the court to take judicial notice of the four prior convictions and admit the conviction documents as exhibits.

¶9      Before the defense presented its case, Counsel advised the trial court that Elton "would like to testify" and that "he would say that he made a mistake as to whether there was a valid protective order in place." After announcing the defense strategy of mistake, Counsel sought the admission of Elton's prior conviction for violating a protective order near the beginning of Elton's testimony.

*The State's Case*

¶10      During its case-in-chief, the State called Nancy, Jalen, Wendy (Elton's adult daughter from a prior relationship who is not a protected party), and two prison investigators to testify. Nancy testified that Elton began calling her immediately after he arrived in prison. Nancy stated that she received "at least" twenty-nine calls from Elton before she finally answered one in February 2021. She answered the call because she thought it might be helpful for Ricky to talk to his father, and she was curious about why Elton was calling. After that, Nancy and Ricky spoke to Elton several times until a phone call to Nancy and Jalen on about April 20, 2021, caused Nancy to stop accepting the calls. Nancy blocked Elton's phone number, but her phone log shows that Elton attempted to call her at least forty-nine times between May 8 and June 1, 2021.

¶11      Nancy testified that she and the children also received several letters from Elton starting in February and continuing through May 2021. Two of the letters served as the basis for two separate counts: a letter addressed to Jalen postmarked February 23, 2021, and one addressed to Nancy postmarked May 13, 2021. Nancy did not read any of the letters to the jury but testified that the contents of one letter scared her. Nancy testified that she

received another letter (Exhibit 7) in June 2021, but the postmark was not entirely legible.

¶12    Nancy stated that she contacted the Utah State Prison on May 24, 2021, to ask them to help stop the contacts and to block Elton's calls. The prison blocked Elton's calls to Nancy around June 1, 2021, and assigned two investigators to look into whether Elton had violated the no-contact order that was imposed in his criminal cases. In addition to the phone calls Elton made to Nancy, investigators discovered that an inmate housed in the same unit as Elton had asked his significant other to call Nancy at Elton's request.

¶13    An investigator talked with Elton on June 9, 2021. The investigator testified that Elton admitted to contacting Nancy and the children by calling and writing letters. Elton initially claimed that he was not aware of the no-contact order that had been entered in 2020. But later, Elton indicated that he had spoken to his former attorney, who had advised him that "there was no longer an order in place." The investigator stated that he "carefully" reviewed the no-contact order with Elton: "I went through the no-contact order word for word. . . . I read it to him and asked if he understood each [clause]." The investigator "strongly suggested that [Elton] cease all contacts or all efforts to contact" Nancy and the children.

¶14    Another investigator from the prison met with Elton on June 21, 2021. The investigator testified that he reminded Elton that "there was a no-contact order in place and admonished him to not have any further contact with [Nancy]." This investigator had also collected the letters Elton had sent to Nancy and the children while he was incarcerated. Just days after the investigator met with Elton, the investigator was notified that Elton's daughter Wendy had called Nancy, on behalf of Elton, to ask her to "drop the protective order." During a subsequent

phone call between Wendy and Elton on June 23, 2021, Elton told Wendy, "When I get out, I am going to do something to [Nancy]."

*Elton's Defense*

¶15    Elton testified in his own defense. He admitted to sending letters and making calls to Nancy, Jalen, and Ricky, and he acknowledged that he was charged with and convicted of five felony domestic violence offenses before being charged in this case. Elton claimed that he did not remember the trial court entering the no-contact order in October 2020, because he was confused and "struggling at the time." He testified that he had previously been on many different medications and was going through withdrawals because he was not receiving his medication at the jail. He stated that the hearing when the no-contact order was entered was a remote hearing that was "difficult and disorienting, and . . . difficult for [him] to understand." According to Elton, the court did not mention or discuss the no-contact order when he pleaded guilty or when he was sentenced.

¶16    Elton testified that because the events surrounding his prior convictions "had kind of been hazy" and he "had some problems" with violating a protective order "in the past," he called his former attorney in February 2021 to see if there was a no-contact order. He said that when his attorney responded after a delay of two-plus months, she told him it would "be fine" to contact Nancy and the children.

¶17    Elton testified that after he was sentenced and first went to prison, Nancy accepted his calls and was "really nice." Elton believed that "everything was going to be alright" and that he could salvage his relationship with Nancy and the children. According to Elton, at some point Nancy stopped answering his calls, which concerned him. He acknowledged that a prison investigator met with him and told him that the no-contact order was still in place and to stop the contact, but Elton claimed that this happened after he talked with his former attorney.

¶18    The attorney who represented Elton in the criminal cases in which the no-contact order was entered testified for the defense. She stated that Elton contacted her around the end of March 2021 to ask if the no-contact order that had been entered in his prior cases was still in effect. After looking into it, the attorney claimed that she told Elton on April 12, 2021, that the no-contact order was no longer in effect. She believed that the no-contact order expired when Elton was sentenced, and she interpreted the "if applicable" language to mean that "the judge would have to enter an additional order . . . saying this is to remain in effect during the incarceration or the parole."

¶19    During cross-examination of Elton, the State linked Elton's prior convictions to Nancy and Jalen. That is, the State asked if Elton "pled guilty to aggravated assault of [Nancy]," "pled guilty to a burglary and a robbery . . . [that] both involved" Nancy, and "pled guilty to child abuse causing a serious physical injury of [Jalen]." In response to a question from the State, Elton admitted that he had damaged his relationship with his children through his actions. The State also asked Elton specifically about Exhibit 7, which was the letter Nancy had testified Elton sent her in June 2021. Elton, however, claimed that he had sent it back in July 2020 when he was in the Utah County Jail.

¶20    After Elton testified, Counsel moved to withdraw Exhibit 7 from evidence. Counsel conceded that he had earlier stipulated to the letter's admission, but Counsel said that he now understood from Elton's testimony that the letter was written before the no-contact order was entered. In light of this, Counsel now argued that the letter was irrelevant and prejudicial. The State objected and argued that Elton was in the Utah County Jail for several months after the no-contact order was entered in October 2020. Furthermore, the State argued, even if the letter was sent in July 2020, before the entry of the no-contact order, it was still admissible to show Nancy and Elton's rocky relationship.

¶21 The trial court asked Counsel if he was aware of any rule that would allow the court to withdraw evidence after it had been admitted. Counsel said no, and the court ruled that Exhibit 7 would remain in evidence and go to the jury but encouraged the parties to propose a jury instruction to address the issue. The parties agreed to instructing the jury that "Exhibit #7 may not be used as evidence that the exhibit violated a protective order; however, Exhibit #7 may be used as evidence for whatever other purpose the Jury sees fit."

*Jury Instructions*

¶22 Counsel requested that the verdict form instruct the jury that it had to be unanimous as to specific dates and acts for each count to ensure juror unanimity. The State agreed that the jury needed to understand that it was required to return a unanimous verdict on all counts but argued that a jury instruction on the issue would be the better course. The State also pointed out that for some phone calls, Nancy "couldn't necessarily give an exact date of when . . . [Elton] called" and gave only a "date range." The State asserted that the jury could "be instructed that if they're going to find the violation occurred, they just need to be unanimous about what that count is and when that . . . occurred even if it is a date range."

¶23 Following the trial court's suggestion, the parties stipulated that the court could instruct the jury on unanimity based upon Model Utah Jury Instruction CR431. That instruction explained that the jury must unanimously agree on which occasion and which act Elton committed for each count:

> The prosecution has charged in Count 1 through Count 15 that MATTHEW ELTON committed VIOLATION OF A PROTECTIVE ORDER multiple times. Although each of these counts has similar or identical elements, you must consider each count separately and reach unanimous agreement on

> whether MATTHEW ELTON is guilty or not guilty
> of each individual count. You may not find the
> defendant guilty of any count unless you
> unanimously agree the prosecution has proven the
> specific act in the elements of the offense for each
> count AND you unanimously agree the prosecution
> has proven all other elements of the count. You may
> find the defendant guilty of all of these counts, none
> of these counts, or only some of these counts; but for
> each count your decision must be unanimous.

The instruction then listed which specific act and date was charged for each count. For Counts 2 through 5, the date of the alleged conduct was listed as a range:

- COUNT 2 is based on the alleged conduct of calling [Nancy] between the dates of February 1 and February 29, 2021.

- COUNT 3 is based on the alleged conduct of calling [Ricky] between the dates of February 1 and February 29, 2021.

- COUNT 4 is based on the alleged conduct of calling [Nancy] between the dates of March 1 and March 30, 2021.

- COUNT 5 is based on the alleged conduct of calling [Ricky] between the dates of March 1 and March 30, 2021.

*Closing Arguments and Conviction*

¶24 In closing, Counsel argued that the main issue in the case was whether Elton "knowingly or intentionally violated" the no-contact order. Counsel asserted that for Counts 6 through 15—which all occurred *after* Elton received legal advice from his

former attorney on April 12, 2021, that there was not a no-contact order in place—Elton did not knowingly and intentionally violate the no-contact order because he believed there was not an order in place. And as for Counts 1 through 5—which all occurred *before* Elton received the advice from his former attorney—Counsel contended that Elton was not aware that the no-contact order had been entered. In support, he pointed to Elton's testimony that he was experiencing "withdrawals from medication" and that the court proceeding was "confusing" because it was conducted remotely, as well as the fact that Nancy did not mention anything about a no-contact order for several months after Elton began contacting her.

¶25    The jury partially accepted Elton's defense. It convicted him on six counts (Counts 1 through 5 and 15) and acquitted him of nine. Of these convictions, five counts were based on phone calls made *before* Elton talked to his attorney on April 12, and the remaining count was for arranging to have Wendy contact Nancy on June 23, 2021, after the prison investigators informed him that the no-contact order was in place. Elton was sentenced to prison.

ISSUES AND STANDARDS OF REVIEW

¶26    Elton now appeals, raising three issues for our review. First, Elton argues that Counsel provided ineffective assistance by introducing Elton's prior convictions for child abuse, aggravated assault, and violating a protective order. He also contends the trial court plainly erred by not sua sponte intervening when the prosecutor engaged in alleged misconduct by using those convictions for character and propensity purposes.

¶27    Second, Elton argues that Counsel provided ineffective assistance by stipulating to the admission of Exhibit 7 and that the trial court abused its discretion by denying Counsel's later motion to withdraw Exhibit 7. Elton further contends that the trial court plainly erred by not sua sponte intervening when the prosecutor

engaged in alleged misconduct by encouraging the jury to use Exhibit 7 and other communications for character and propensity purposes.

¶28    Third, Elton claims the trial court erred by giving an incorrect unanimity instruction to the jury, and that Counsel was ineffective for approving the incorrect instruction.

¶29    Elton's claims are subject to the following standards of review. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657 (quotation simplified). Likewise, "plain error is a question of law reviewed for correctness." *Id.* (quotation simplified). "We review the trial court's decision to admit or exclude evidence for abuse of discretion." *State v. Nunez*, 2021 UT App 86, ¶ 27, 498 P.3d 458 (quotation simplified).

ANALYSIS

I. Prior Convictions

¶30    Elton argues that the "admission of and repeated references to Elton's prior crimes warrants reversal." Specifically, he faults Counsel for introducing his prior convictions for child abuse, aggravated assault, and violating a protective order. Relatedly, he contends the trial court plainly erred by not sua sponte intervening when the prosecutor engaged in alleged misconduct by discussing the "details" of Elton's prior convictions and using them for character and propensity purposes.

A.     Admission of prior convictions

¶31     At trial, the jury learned that Elton had prior convictions for child abuse, aggravated assault, and violating a protective order, among others. Counsel stipulated to the admission of certified copies of the judgments of conviction for Elton's child abuse and aggravated assault convictions, and Counsel introduced the evidence of Elton's conviction for violation of a protective order during Elton's direct testimony, after determining that Elton's testimony would raise a mistake defense. Elton contends that both of Counsel's actions amount to ineffective assistance.[4]

¶32     To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires the defendant to show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Id.* at 687. Because "a defendant's inability to establish either element defeats a claim for ineffective assistance of counsel," we are free

---

4. Counsel initially opposed the admission of Elton's prior conviction for violating a protective order. In response, the trial court disallowed the conviction in the State's case-in-chief but indicated that after "hear[ing] the evidence and the defense," it would consider allowing the conviction to be admitted if Elton raised a mistake defense. Elton argues the court erred in determining that the conviction was admissible because the prior conviction was not relevant to the particular mistake defense offered and, in any event, the prior conviction was substantially more prejudicial than probative under rule 403 of the Utah Rules of Evidence. But as Elton himself acknowledges, the court "technically reserved its final ruling" until the defense presented its case. Thus, because the court never actually determined that the prior conviction was admissible, any blame in introducing the conviction falls on Counsel, not the court.

to reject such a claim under either prong. *State v. Wright*, 2021 UT App 7, ¶ 52, 481 P.3d 479 (quotation simplified). We resolve this claim under the prejudice prong.

¶33 To establish prejudice, Elton bears the burden of proving that Counsel's errors had an adverse effect on the defense and "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. When evaluating a prejudice claim in the ineffective assistance context, "we assess counterfactuals scenarios—that is, what would have happened but for the ineffective assistance." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203. In making this determination, "we consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record." *State v. Griffin*, 2015 UT 18, ¶ 21, 441 P.3d 1166 (quotation simplified).

¶34 Elton has not met his burden to show that he was prejudiced by Counsel stipulating to the admission of Elton's prior convictions for child abuse and aggravated assault or for introducing Elton's prior conviction for violating a protective order. This is so for multiple reasons.

¶35 First, evidence of Elton's prior convictions, with the stipulation that neither party would delve into the underlying details of those convictions, was admissible evidence that was intrinsic to the violation of a protective order crimes charged here. *See State v. Blackwing*, 2025 UT 60, ¶ 34. Evidence of prior acts is "intrinsic" "when there is a direct relationship between the act and the charged crime." *Id.* ¶ 31. "To be considered intrinsic, the acts must be an integral and natural part of the circumstances surrounding the offense for which the defendant is charged or

directly connected to the factual circumstances of the crime." *Id.* (quotation simplified). Here, Elton's prior convictions are intrinsic because "[t]here is a direct relationship between [Elton's prior convictions] and the crimes for which [Elton] is on trial." *Id.* ¶ 34. All of Elton's charges here were based on violating the no-contact order. Evidence of Elton's prior convictions explained the nature of the no-contact order, including the victims and the other parties involved, the nature of their relationships, why the no-contact order had been entered, why he knew he was subject to the no-contact order, why he was in prison, why he sought the advice of his former attorney, and why prison investigators were speaking with him. Because Elton's prior convictions led to his current charges, introducing this evidence allowed Counsel to highlight Elton's argument that he was both unaware that the no-contact order had been entered before the cases were resolved and that he believed the no-contact order expired after he was sentenced. Thus, the evidence of Elton's prior convictions was unlikely to so prejudice the jury against Elton that knowing he had been previously convicted altered the outcome of the trial.

¶36 Second, the evidence against Elton was strong. Elton did not deny calling and sending the letters to Nancy and the children. For all the violations for which Elton was convicted, the State presented strong direct evidence that Elton knowingly or intentionally violated the no-contact order. For Counts 1 through 5, which were for violations that occurred before Elton received advice from his former attorney, the evidence showed that the no-contact order was entered in his prior case and was not vacated or amended by the judge. And the evidence supporting Elton's conviction on Count 15 is similarly strong. Although this violation occurred after Elton spoke with his former attorney, it also occurred *after* the prison investigators sat down with Elton and carefully went over the no-contact order with him and reiterated the consequences for violating it. Despite this, Elton still attempted to contact Nancy through Wendy. Due to the strength of the evidence on these counts, we fail to see any reasonable

likelihood of a different result for Elton had evidence of his prior convictions been excluded.

¶37 Third, the jury's split verdict shows that it carefully evaluated the evidence, not simply convicted on propensity. The jury acquitted Elton of nine of the fifteen counts, which demonstrates that it paid close attention to the relevant dates when evaluating the charges. While Elton's prior convictions may have carried some prejudicial weight, introducing evidence of those convictions allowed Elton to introduce the testimony of his former attorney to support his mistaken belief that the no-contact order was not in effect. Given all this, there is no reasonable likelihood that Elton would have been acquitted on any additional counts had evidence of his prior convictions been excluded.

B.    Prosecutorial misconduct

¶38 Next, Elton argues that regardless of whether his prior convictions properly came in, the prosecutor "engaged in misconduct by discussing the details of the crimes (rather than the simple record of conviction) and using them for an improper character or propensity purpose." Because Counsel did not object to the majority of this alleged misconduct below, our review is for plain error.[5] *See State v. Hummel*, 2017 UT 19, ¶ 105, 393 P.3d 314.

---

5. Counsel objected below to two instances of alleged misconduct: a question concerning the number of times Elton had been arrested and a question regarding whether Elton's relationships with his family had been damaged because of his actions. The trial court sustained Counsel's objection to the first question but overruled his objection to the second question. Because the claims based on these particular objections were preserved, we review the trial court's rulings for an abuse of discretion. *See State v. Henfling*, 2020 UT App 129, ¶ 31, 474 P.3d 994. As to the first claim,

(continued…)

¶39    "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the trial court." *State v. Ringstad*, 2018 UT App 66, ¶ 62, 424 P.3d 1052 (quotation simplified). When evaluating prosecutorial misconduct in the context of plain error, it is not our role to "review the actions of counsel—at least not directly." *Hummel*, 2017 UT 19, ¶ 107. Rather, we "review the decisions of lower courts" and determine "whether counsel's missteps were so egregious that it would be plain error for the district court to decline to intervene sua sponte." *Id.* ¶¶ 107, 110 (emphasis omitted); *see also id.* ¶ 107 ("[P]lain error review considers the plainness or obviousness of the district court's error (not the prosecutor's).").

¶40    Elton contends the prosecutor improperly questioned Elton by eliciting information about his prior convictions in an attempt to persuade the jury to convict based on Elton's propensity to commit bad acts. Specifically, he points to the following information that was revealed during Elton's cross-examination: (1) the victim in Elton's prior aggravated assault case was Nancy, (2) the victim in Elton's prior child abuse case was Jalen, (3) Elton's prior aggravated assault conviction stemmed from a "disagreement" with Nancy, (4) Elton had been involved in "multiple different criminal cases," and (5) Nancy is "a domestic violence victim." Additionally, Elton complains it was improper for the prosecutor to argue in closing that it was

---

there was no error because the court sustained the objection and Elton "makes no attempt to argue that the judge's response to the objection was inadequate." *See State v. Hummel*, 2017 UT 19, ¶ 120, 393 P.3d 314. And as to the second claim, Elton has not engaged with the court's rationale for overruling the objection. Consequently, Elton has failed to "demonstrat[e] any error on the part of the trial court." *State v. Millett*, 2025 UT App 67, ¶ 34, 572 P.3d 389 (quotation simplified). We therefore do not further address this claim.

"vitally important to understand and to remember" that Nancy and the children were domestic violence victims. As with Elton's related ineffective assistance claim, we ultimately need not determine whether the complained-of statements were improper because they were not harmful. That is, absent the remarks, there is no "reasonable likelihood of a more favorable outcome" for Elton. *State v. Popp*, 2019 UT App 173, ¶ 36, 453 P.3d 657 (quotation simplified).

¶41   First, many of the prosecutor's questions with which Elton takes issue revealed merely cumulative information. "When testimony is merely cumulative, we are usually disinclined to find prejudice even when the testimony was improperly admitted. This is because such testimony does not typically offer anything new or additional to the evidentiary picture." *State v. Macleod*, 2024 UT App 32, ¶ 53, 546 P.3d 366 (quotation simplified), *cert. denied*, 558 P.3d 87 (Utah 2024). For example, the jury was presented with testimony indicating that Elton had previously hurt Nancy and Jalen. Nancy testified—over Counsel's objection—about a conversation Elton had with her and Jalen where Elton apologized for hurting Jalen and claimed that he had never hit Nancy. And text messages from Nancy to Wendy that characterized Elton as "a women beating child abuse[r]" were included in one of the State's trial exhibits.[6] Moreover, the jury was aware that Elton and Nancy had "disagreements" "throughout the course of [their] marriage" because Elton himself admitted this on direct examination. And the jury was also well aware that Elton had been involved in "multiple" criminal cases given that Counsel had stipulated to the record of conviction for two separate cases.

¶42   Second, Elton overstates the prejudicial effect of the alleged prosecutorial misconduct. According to Elton, the prosecutor

---

6. With one exception, Elton did not object to the admission of the State's exhibits, including the text messages identified above.

elicited the "details" of Elton's crimes through his questioning. However, the details to which Elton points are not so harmful as to undermine our confidence in the verdict. While the jury learned that Nancy and Jalen were the victims in Elton's prior cases, the jury did not learn the specific acts giving rise to the aggravated assault and child abuse charges. And when some minor details about Elton's conduct filtered in when witnesses volunteered unnecessary testimony, Counsel successfully objected to these instances, and Elton has not shown that the trial court's curative instructions were ineffectual. *See State v. Wright*, 2013 UT App 142, ¶ 42, 304 P.3d 887 ("In the absence of any circumstances suggesting otherwise, courts presume that the jury follows [curative] instructions.").

¶43    Third, the jury's split verdict suggests that it carefully considered the evidence and was not improperly influenced by the prosecutor's allegedly improper remarks. Thus, there is no reasonable likelihood that Elton would have been acquitted on any additional counts had the challenged information been excluded.

¶44    For all these reasons, we are not persuaded that Elton was harmed by any of the prosecutor's allegedly improper remarks. His plain error claim therefore fails.

## II. Exhibit 7

¶45    Elton next argues that the admission and use of some of his communications warrants reversal. Specifically, he contends that Exhibit 7 was inadmissible and should not have been shown to the jury. He further contends that the prosecutor engaged in misconduct by encouraging the jury to use Exhibit 7 as character and propensity evidence.

A.      Admission of Exhibit 7

¶46     Elton argues that Exhibit 7 was inadmissible because it predated the entry of the no-contact order and contained "incredibly prejudicial content." He thus contends that Counsel was ineffective for stipulating to its admission. He also asserts that the trial court abused its discretion by declining Counsel's request—made after Counsel became convinced the letter predated the no-contact order—to withdraw Exhibit 7. We address each in turn.

1.      Ineffective assistance

¶47     As explained above, to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that his counsel performed deficiently and that this deficient performance was prejudicial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Wright*, 2021 UT App 7, ¶ 52, 481 P.3d 479 (quotation simplified). Because Elton has not shown that he was prejudiced by Counsel stipulating to the admission of Exhibit 7, his claim fails.

¶48     First, there is no "reasonable probability" that the result of the trial would have been different absent the introduction of Exhibit 7. *See Strickland*, 466 U.S. at 694. Counsel stipulated to the introduction of seven of Elton's letters at trial. Even assuming that Exhibit 7 should not have been admitted, Elton makes no attempt to explain how excluding that particular letter would have resulted in an acquittal where the six other letters also established the charged conduct. *See State v. Leech*, 2020 UT App 116, ¶ 44, 473 P.3d 218 ("Errors involving the improper admission of evidence are often harmless where there is other overwhelming evidence in the record proving the defendant's guilt."). Indeed, Elton's prejudice argument is largely limited to listing excerpts from Exhibit 7 and arguing that the content is "incredibly prejudicial." But that argument confuses the point that by simply *sending* the

letters Elton violated the no-contact order; the content of the letters was irrelevant.

¶49    Second, the trial court instructed the jury that Exhibit 7 was not direct proof of a violation. Elton has not pointed to anything that would cause us to depart from our general presumption "that a jury will follow the instructions given it." *State v. Beckering*, 2015 UT App 53, ¶ 24, 346 P.3d 672 (quotation simplified). Thus, we presume that any potential for misuse was limited by virtue of this instruction.

¶50    Lastly, again, the jury's split verdict shows that it carefully evaluated the evidence, not simply convicted on propensity. Thus, there is no reasonable likelihood that the outcome at trial would have been any different had Exhibit 7 been withdrawn. Consequently, Elton cannot demonstrate prejudice.

2.      Trial court error

¶51    After Elton testified, Counsel moved to withdraw Exhibit 7 on the ground that the letter predated the no-contact order and it was therefore irrelevant and prejudicial. The trial court denied Counsel's request, opining it was not aware "of any rule that allows [a court] to withdraw evidence after it's been admitted." Elton contends the court's determination that it did not have power to withdraw Exhibit 7 was legally incorrect and the court therefore abused its wide discretion by not withdrawing Exhibit 7 when given the chance.

¶52    In this case, we do not need to decide whether the trial court's ruling was correct on the merits because "[e]ven when evidence is improperly admitted, reversal is required only where the admission of the evidence amounted to prejudicial error." *Avalos v. TL Custom, LLC*, 2014 UT App 156, ¶ 19, 330 P.3d 727. That is, reversal is necessary only when "there is a reasonable likelihood that the error[] affected the outcome of the

proceedings." *State v. Gallegos*, 2020 UT App 162, ¶ 62, 479 P.3d 631 (quotation simplified).

¶53   For the reasons discussed in the prior section, *see supra* ¶¶ 48–50, there is no reasonable likelihood that withdrawing Exhibit 7 would have changed the outcome at trial. Even without that letter, there were six other letters establishing the charged conduct. *See Leech*, 2020 UT App 116, ¶ 44. Moreover, the trial court instructed the jury that Exhibit 7 was not direct proof of a violation. *See Beckering*, 2015 UT App 53, ¶ 24. Finally, the jury's split verdict indicates that it carefully considered the evidence and did not convict based on propensity.

B.     Prosecutorial misconduct

¶54   Next, Elton argues that regardless of whether Exhibit 7 should have been excluded, the prosecutor engaged in misconduct by encouraging the jury to use the letter as character evidence.[7] Because Counsel did not object to this alleged

---

7. Elton identifies four additional instances of alleged misconduct stemming from questions the prosecutor asked Nancy, Jalen, a detective, and one of the prison investigators about some of Elton's other communications. Of these instances, Counsel successfully objected to the prosecutor's questioning of the prison investigator, and Elton "makes no attempt to argue that the judge's response to the objection was inadequate." *See Hummel*, 2017 UT 19, ¶ 120. We thus discern no error with regard to this questioning. As for the other three instances, we are not convinced that Elton suffered harm. Given the sheer amount of admissible evidence showing that Elton repeatedly contacted his family in violation of the no-contact order, we see no "reasonable likelihood of a more favorable outcome" for Elton had the prosecutor not questioned Nancy, Jalen, and the detective about Elton's communications. *See State v. Popp*, 2019 UT App 173, ¶ 36,

(continued…)

misconduct below, our review is for plain error. *See State v. Hummel*, 2017 UT 19, ¶ 105, 393 P.3d 314.

¶55 To prevail under plain error review, Elton must show "the existence of a harmful error that should have been obvious to the trial court." *State v. Ringstad*, 2018 UT App 66, ¶ 62, 424 P.3d 1052 (quotation simplified). However, "the harm factor in the plain error analysis is equivalent to the prejudice test applied in assessing claims of ineffective assistance of counsel." *State v. Bair*, 2012 UT App 106, ¶ 35, 275 P.3d 1050 (quotation simplified). Because we have concluded that Elton cannot demonstrate prejudice on this issue as part of his ineffective assistance of counsel claim, *see supra* ¶¶ 48–50, his plain error claim on this point necessarily fails.

### III. Unanimity Instruction

¶56 Lastly, Elton argues that his convictions on Counts 2 through 5 must be vacated because there is no indication that they were unanimous. He contends the trial court erred by proposing the wrong jury instruction on unanimity, and he further faults Counsel for then stipulating to that incorrect instruction.

¶57 The Unanimous Verdict Clause of the Utah Constitution requires that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. The "requirement of unanimity is not met if a jury unanimously finds only that a defendant is guilty of a crime." *State v. Hummel*, 2017 UT 19, ¶ 26, 393 P.3d 314 (quotation simplified). "A jury must be unanimous on all elements of a criminal charge for a conviction to stand." *Id.* ¶ 29 (quotation simplified). "When a defendant is charged with multiple offenses with identical or similar elements, unanimity as to the elements requires that the jury be unanimous regarding the specific act

_____

453 P.3d 657 (quotation simplified). We therefore reject Elton's plain error claim on this point.

supporting the conviction." *State v. Chadwick*, 2024 UT 34, ¶ 32, 554 P.3d 1098.

¶58 Elton was charged with fifteen counts of violating a protective order. For Counts 2 and 3, Elton was charged with violating a protective order "between the dates of February 1 and February 29, 2021." And for Counts 4 and 5, Elton was charged with violating a protective order "between the dates of March 1 and March 30, 2021." During trial, the State asserted that Elton had likely "violated the protective order hundreds of times" but that he had been charged with "only" fifteen violations, and the State recognized it would ultimately "have to choose those specific" fifteen. But at the end of the trial, for Counts 2 through 5, the State failed to elect which specific violation supported each charge; instead, the jury was provided with a victim name and a one-month range and instructed that if the victim was called during that time period it was a violation. However, at the trial court's suggestion—and with Counsel's approval—the jury was read a jury unanimity instruction based on Model Utah Jury Instruction CR431, clarifying that when considering multiple counts of the same crime, the jury "must consider each count separately and reach unanimous agreement on whether [the defendant] is guilty or not guilty of each individual count."

¶59 Elton contends that the trial court erred in proposing this unanimity instruction, and that Counsel performed deficiently by subsequently approving it, because it does not address the unanimity problem at issue. According to Elton, the issue here is that the State presented evidence of "multiple alleged acts within a given time frame" but charged only one. Thus, he argues, the risk was not that the jury might not consider all of the various charges separately (thereby providing a generic guilty verdict for all counts) but, instead, that the jurors might disagree on the particular act committed but still convict. And Elton asserts that the latter concern is dealt with in a different instruction—Model

Utah Jury Instruction CR432—that was not read to the jury.[8] The State counters that we should not review this claim because Elton "invited any error in the instructions" when Counsel affirmatively represented to the trial court that he approved the unanimity instruction. *See State v. Geukgeuzian*, 2004 UT 16, ¶ 9, 86 P.3d 742 ("A party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." (quotation simplified)). While the State is correct that Counsel approved the unanimity instruction and thus invited any error in the instruction—thereby foreclosing a claim of trial court error—invited error "does not preclude a claim for ineffective assistance of counsel." *State v. Popp*, 2019 UT App 173, ¶ 25, 453 P.3d 657 (quotation simplified). We therefore analyze whether Counsel was ineffective for approving the instruction.

¶60 Ultimately, we need not decide whether Counsel performed deficiently by approving the unanimity instruction suggested by the trial court because Elton has failed to demonstrate that he was prejudiced by the use of the allegedly erroneous instruction. That is, there is no "reasonable probability the jury would not have convicted [Elton] if the jury instructions had been correct." *State v. Grunwald*, 2020 UT 40, ¶ 22, 478 P.3d 1.

---

8. Both model instruction CR431 and model instruction CR432 are unanimity instructions. *Compare* Model Utah Jury Instructions 2d CR431 Committee's Notes to the 2022 amendment, https://legacy.utcourts.gov/muji/?cat=2&subcat=32 [https://perma.cc/JS2F-49LW] ("CR431 should be used in circumstances where multiple counts have identical elements but are alleged to have occurred on different occasions or are different acts allegedly committed on the same occasion."), *with id.* CR432 Committee's Notes to the 2024 amendment ("CR432 should be used in circumstances where the prosecution has presented evidence that the offense may have occurred more times than the prosecution has charged.").

¶61    First, the jury convicted Elton on only six of the fifteen counts. This selective verdict demonstrates careful evaluation and undermines any claim that jurors convicted on different acts without unanimity. Moreover, this split verdict illustrates that the jury discriminated between acts, which further suggests that it did not convict based on generalized dislike of Elton or cumulative acts.

¶62    Second, where, as here "the defendant does not dispute that the relevant acts . . . occurred, and there is no meaningful and relevant basis upon which to distinguish the various acts underlying the charges, the absence of a jury unanimity instruction ultimately does not prejudice the defendant because the jury would have had no difficulty in unanimously agreeing that any one of the relevant criminal acts supported the charges." *State v. Mottaghian*, 2022 UT App 8, ¶ 66, 504 P.3d 773. For Counts 2 through 5, Elton was charged with violating a protective order for calling Nancy in February, Ricky in February, Nancy in March, and Ricky in March, respectively. At trial, Nancy did not testify that Elton called her or Ricky on a specific day. Rather, she testified that Elton called her "at least" twenty-nine times after he arrived in prison but before she answered, that she talked to Elton five or six times before she stopped talking to him in April, and that Ricky talked to Elton "at least" ten times in that same time period. By convicting Elton on these counts, the jury necessarily believed Nancy's testimony. Because the evidence as to each count was essentially identical (i.e., Nancy did not testify that she was contacted on a specific date), we see no reasonable probability that the jury would have acquitted Elton on any of these counts had it been asked to agree on a single phone call for each. Put differently, because any of these calls would have been a violation, if Elton was guilty of doing one of the acts—which the jury found he was—he was guilty of them all.

CONCLUSION

¶63 Elton's claims of ineffective assistance of counsel and trial court error all fail for lack of prejudice. Accordingly, we affirm Elton's convictions.

─────────